ELIAS et al. v. CLARKE et al.

No. 312.

Circuit Court of Appeals, Second Circuit.

June 20, 1944.

Abraham Mitnovetz, of New York City, for claimants-appellants Elias, Menachen, and Moise.

Louis Boehm, of New York City (Boehm & Fischman, Geist & Netter, Netter & Netter, and Bernard D. Fischman, all of New York City, on the brief), for claimants-appellants Jones, Sutton, Van Kirk, and Perlman.

Samuel J. Silverman, of New York City (Stanley Clarke, Allen E. Throop, O. John Rogge, and William W. Golub, all of New York City, on the brief), for respondents-appellees Clarke and others.

Jack Lewis Kraus, II, of New York City (Harry B. Kurzrok, Kelsey, Waldrop & Spalding, H. Boardman Spalding, Breed, Abbott & Morgan, Lloyd V. Almirall, and William Roberts, all of New York City, on the brief), for respondents-appellees Associated Gas and Electric Company's Senior Creditors.

Before SWAN, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

This appeal brings up for review an order of the district court in reorganization proceedings, classifying certain obligations of the debtor, Associated Gas and Electric Company, as junior in character to other obligations which are more than sufficient to exhaust the debtor's estate. The issue involves peculiarly interesting questions of priority and subordination of corporate bonds in that the district court has made a distinction between original holders and transferees of certain bonds and has subordinated the claims of transferees to an extent which it has not been prepared to go with respect to the claims made by original holders of the same bonds. For an understanding of this comparatively narrow issue a full exposition of the Company's towering and complicated financial structure is not necessary and, indeed, may be confusing. Hence we shall limit our discussion to the facts immediately pertinent. A more extensive statement of facts may be found in the opinion of the district court, In re Associated Gas & Electric Co., D.C.S.D.N.Y., 53 F.Supp. 107; and yet other facts appear in a later opinion of the district court, In re Associated Gas & Electric Co., D.C.S.D.N.Y., 53 F.Supp. 118, which deals with a plan for the compromise of other claims in issue below. As we shall see, only the fact of compromise, and not the details of its terms, is before us at this time.

The main problem herein arises because of a difference of view as to the legality of an option for conversion into preferred stock of the debtor's bonds known as Convertible Debenture Certificates (called by the parties herein, CDC's), of which $36,-333,539 was publicly held on May 11, 1932. Appellants challenge the legality of this option because it was reserved to the Company, and not to the holders of the bonds; and they further challenge its attempted exercise here on the ground of nonfulfillment of certain conditions precedent, namely, that the Company should not be in default in the payment of dividends on its preferred stock and should not have transferred its assets to another corporation not assuming payment of the obligations.[1]

---

[1] Typically the conversion privilege read that "this Certificate may, at the option of the Company, at any time after six months from the interest payment date next succeeding the date of original issue hereof * * * be converted"

On May 11, 1932, the debtor sent a letter to the registered holders of these bonds informing them that its directors had determined to exercise the privilege of conversion, and that the bonds were ipso facto converted into preferred stock on June 15, 1932. It then, however, went on to offer holders the privilege of taking in lieu of the stock "a newly authorized issue of convertible obligations * * *. [which] contain provisions more favorable to the holders and are believed to be more desirable, until converted, than the stock into which your present holdings are now convertible." These new obligations were "Convertible Obligations, due 2002" (of two series, "A" and "B," together called CO-AB's by the parties), which, however, contained express provisions that they were subordinate to "all bonds, debentures and other indebtedness of the Company" and any successor to it, "except (1) the Obligations of this issue and (2) indebtedness or Obligations convertible at the option of the Company into stock of the Company of any class or subordinated by their terms to other indebtedness or obligations of the Company." No such subordination provisions appeared in the original CDC's. The COAB's were an already existing issue, and a considerable number of present holders of them—to a face value in excess of twenty millions—are not involved in this present dispute, which concerns only those who took these bonds in exchange for CDS's pursuant to the Company's offer.

This offer the Company repeated in several subsequent letters. Eventually, while a small amount of CDC's remained unconverted and a still smaller amount was converted into preferred stock, the offer was accepted by holders of bonds in excess of $30,000,000, of which now, as the parties estimate, about one-third in face value is still held by the original takers, while the balance is held by the transferees, who are represented herein by the appellants, the

Elias Protective Committee. The Company paid interest upon these bonds at first, and then, in 1933, issued therefor certain unsubordinated scrip which is not involved here. Thereafter it paid no interest, but in 1936 and 1937, it resumed the issue of scrip for interest, which took two forms—Interest Bearing in multiples of $100 face amount and Non-Interest Bearing for fractions of $100 face value, called by the parties IB Scrip and NIB Scrip. This scrip, however, contained subordination provisions substantially identical to those of the COAB's themselves. Scrip so issued to an amount in excess of $10,000,000 was outstanding when the debtor filed its petition for reorganization January 10, 1940, and the holders thereof are represented by the second protective committee, who are appellants herein, the Jones Committee, and by one individual appellant, Murray Perlman.

Upon the initiation of the reorganization proceedings and when the time set by the court for presenting claims had expired, it appeared that not only were there various classes of security holders, but that objections were being offered as to their classification on a parity. Hence the court referred all these issues to Honorable Frederick E. Crane, former chief judge of the New York Court of Appeals, as special master to hear the evidence and to report his findings of fact and conclusions of law "as to the validity, priorities and proper division into classes of said claims." The learned special master held extensive hearings wherein the holders of the exchanged bonds and the scrip participated and presented their claims that the original conversion option was illegal and illegally exercised, that they thus had the right to rescind the transaction by which the new bonds were exchanged for the original bonds, notwithstanding the passage of time and the receipt of interest and scrip, and hence that they were entitled to be placed

---

into described stock of the Company "(if the Company is not then in default in payment of dividends upon its then outstanding Preferred Stocks)." The described stocks varied somewhat among the different series of certificates, but in general they would be a series bearing the same dividend rate as was the interest rate of the certificates. Certain series of the certificates also provided expressly that they were not convertible if their principal had become payable; as to all of them the principal,

while not subject to any specified due date, became due on the happening of certain specified events, which included default in payment of interest, insolvency or bankruptcy, as well as on transfer of assets to a purchaser who did not assume the debtor's obligations under the issue. Appellants argue with force that, even where this latter proviso was not express, the bonds could not remain convertible after they had become due and dishonored on happening of any of these events.

on an equality with holders of the unsubordinated CDC's. In addition, they asserted that the subordination provisions of their present holdings were ambiguous and illusory in character and were unenforceable.

In due course the master filed his report, together with his findings of fact and conclusions of law; and those are before us, so far as they concern the bonds here in dispute, and are most detailed and complete both with reference to the facts found and the conclusions of law reached. The master held that the conversion option of the CDC's was valid and legal, that it was validly and properly exercised, that the offer of bonds in substitution for preferred stock was made in good faith and without fraud, that the subordination provisions of the COAB's and the scrip were valid and enforceable, and hence that all the obligations here involved were subordinate to the debtor's senior obligations. In view of the amount of the latter, this conclusion meant that the holders of these securities, including these claimants, could not share in the estate and hence had no interest in any plan for reorganization of the debtor. The master indicated, however, a possibility of legal question as to his conclusions with reference to the claims made by original holders of COAB's taken in exchange for CDC's, but not as to the claims made by the transferees or the holders of the scrip.

This differentiation in legal vulnerability of the respective claims apparently suggested to the managers of the reorganization that when an extensive agreement for compromise of these and related proceedings was being negotiated, some offer should be made to the holders of the less doubtful claims. In any event, negotiations have resulted in a compromise which settles, among other things, the legal issues between this company and a corporation to which its assets were transferred, the Associated Gas and Electric Corporation, and provides for a plan of reorganization of the whole Associated Gas & Electric system. In that compromise the claims of the original holders of COAB's in exchange for CDC's—as well as of those who did not convert or who took preferred stock—were settled by their recognition to the extent of 40 per cent of their face value. As appears from the second of the two opinions of the district court cited above, the special master has now recommended acceptance of this compromise. Because of its existence, the trustee moved below herein to confirm only that part of the master's report which

rejected the claims of the transferees and of the scrip holders; and the district court took that course in granting the motion. The court thus held in reserve the claims granted some recognition in the compromise with the obvious purpose of considering later and as a single matter the validity of the compromise and of the accompanying plan of reorganization.

The appellants herein, acting on behalf of the transferees and the scrip holders, attack the result below both in form and on the merits. They claim that the partial disposition of the matter by the district court was illegal and prejudicial as to them, depriving them of a fair consideration of their claims; and then they reiterate their contentions that the conversion option to the Company in the original CDC's was illegal under New York law and was in any event not legally exercised, that they were thus entitled to rescind—and as they assert, fully as much so as the original holders, indeed, that the contrary holding deprives them of their rights only to give an illegal windfall to the debtor's senior creditors— and that the subordination provisions of the newly received obligations were invalid. Against this it is the contention of the debtor's trustee and the trustee of Agecorp, the companion corporation in reorganization, supported also by a group of claimants who identify themselves as "Senior Creditors," that, even assuming the invalidity of the original conversion of the bonds, still at the utmost the holders had only rights of rescission for fraud or misrepresentation which did not pass to the transferees. Hence in any event the latter and all others in like position, i. e., the scrip holders, would have no valid claims to a parity with senior creditors. Implicit in appellees' argument appears to be the hope that we will say nothing about the claims of the original holders which may have repercussions against the ready acceptance of the plan of compromise already agreed upon. Seemingly, of course, claims for rescission are still held by transferors of the bonds; but so far as appears, none have presented claims herein, presumably either because they did not know of, or choose to enforce, their rights or were satisfied by the terms on which they had transferred their bonds.

■ With respect to the procedure adopted by the district judge in classifying only a part of the claims at one time, we are not prepared to say that his action was

beyond his discretion. True, it might have been somewhat easier, in the view we take of the case, for us to have passed upon the matter as a single unit; but that fact does not mean that the chosen course was erroneous. Clearly a bankruptcy court must have some leeway to take up matters involving certain claimants only without the necessity of opening the whole case at large before it. In view of the size of the corporate structures involved in reorganization proceedings, often no other course would seem possible or certainly at least feasible. In civil actions the rules provide for the separate trial of separate issues "in furtherance of convenience or to avoid prejudice," Rule 42(b), and cf. Rules 13(i), 20(b), and 21, 28 U.S.C.A. following section 723c. These rules certainly are applicable in bankruptcy under G.O. 37, 11 U.S.C.A. following section 53, and, indeed, are perhaps more readily available there, since the practice of interlocutory appeals in bankruptcy provides for the complete splitting of the issues even upon review, whereas a civil appeal requires generally a final judgment disposing of an entire matter. Rule 54(b); Audi Vision, Inc., v. RCA Mfg. Co., 2 Cir., 136 F.2d 621, 147 A.L.R. 574. Even so, however, we do not consider ourselves bound to adopt in entirety the theory upon which the order was based, or to accept the somewhat violent assumptions suggested to us as grounds for sustaining it. After all, the compromise agreement is not before us, and what we say here is not an adjudication upon it. Further, if the questions now before us are directly involved in the compromise and the plan of reorganization, it seems improbable that answers to them can be avoided ultimately.

 Turning, therefore, to the merits, we find ourselves initially in accord with the view that under the governing New York law a claim for fraud or misrepresentation in connection with an obligation evidencing a debt, whether for damages or for rescission, does not pass merely with the transfer of the obligation itself, where there are lacking special words of assignment of the claim. Here the bonds were transferred upon execution of a usual and stereotyped form of bond transfer, found on the back of the certificate, which only purported to assign and transfer "the within Convertible Obligation." That this is insufficient as an assignment is the precise holding of Abel v. Paterno, 245 App.Div. 285, 281 N.Y.S. 58, and is the substantial effect of a series of cases in the Court of Appeals involving various claims against trustees for bondholders for different forms of wrongful acts, cases of which the latest is Smith v. Continental Bank & Trust Co. of New York, 292 N.Y. 275, 54 N.E.2d 823, and which we discussed at some length in Manufacturers Trust Co. v. Kelby, 2 Cir., 125 F.2d 650, certiorari denied 316 U.S. 697, 62 S.Ct. 1293, 86 L.Ed. 1766. In appellees' view, this conclusion should end the appeal, for they say that we must assume fraud and misrepresentation in the debtor's letters undertaking to exercise the conversion option, based as they obviously were on a claim of right so to act. But belief in the validity of the option is surely not unreasonable, and an assumption that its assertion was fraudulent is rather violent. We may note that if such an assumption must be made, apparently the order below did not go far enough in one particular. For that order classified with original holders of the COAB's "their personal representatives, legatees, or distributees, or statutory successors," and this was spelled out in the opinion to include "an administrator, executor, or other legal successor by operation of law to all the rights and claims of the original holders," but not those acquiring the new bonds "by purchase or gift" from original holders. 53 F.Supp. at page 114. But Hendry v. Title Guarantee & Trust Co., 255 App.Div. 497, 8 N.Y.S.2d 164, affirmed 280 N.Y. 740, 21 N.E.2d 515, is authority for the proposition that a taker by inheritance acquires only the bond, and not an existing collateral right of action. This would seem to follow from the theory of the rule, to wit, that, while the right of action is assignable, yet it is not covered by a mere assignment of the obligation itself. Often, of course, a legatee, and even more, a distributee, will succeed to the right of action just as he does to the obligation; but this does not follow as of course and necessitates proof in each instance.

Nevertheless we think it unfair to the appellants, who have presented the case on the merits, to rest a decision on an assumption which seems so thoroughly opposed to the realities. How far was the exchange of COAB's for CDC's actually the result of fraud and misrepresentation giving rise to a right of action against the debtor? The special master made specific and exact findings that the option to take COAB's in lieu of the preferred stock in which the CDC's

was converted "was made in good faith and was not fraudulent." In truth, therefore, fraud must be discovered only as a matter of conclusion from the conceded facts; and as we shall point out later, we find none. More fairly put, the assumption seems to come to this, that the parties were mistaken as to the legality of the option. Even if we assume such a mutual mistake, two further questions arise: one whether a claim so directly affecting the validity of the security itself going back to an initial legal invalidity of a portion of the original bond is within the New York law against the transfer of a claim for fraud except by express assignment, and the other whether under modern New York law rescission of what was essentially a novation can be had for such a mutual mistake of law. Cf. Jacobs v. Morange, 47 N.Y. 57; Bowden v. Owen, 103 Misc. 56, 171 N.Y.S. 778, affirmed 187 App.Div. 910, 173 N.Y.S. 901, and 227 N.Y. 612, 125 N.E. 913; Rosenblum v. Manufacturers Trust Co., 270 N. Y. 79, 200 N.E. 587, 105 A.L.R. 947; 5 Williston on Contracts, Rev.Ed. 1937, §§ 1582–1588.

We shall not attempt to answer these questions, since we prefer to face the basic issue as to whether the option contained in the original CDC's was invalid under New York law. And we entertain no doubt but that it was valid. The distinguished jurist who sat as special master so held in an opinion which is persuasive by virtue not alone of its author's wide acquaintance with local law, but also of its clear-cut reasoning. That opinion seems to us well supported by the applicable analogies.

The argument to the contrary is based primarily upon the fact that New York Stock Corporation Law, § 16, Consol. Laws N.Y. c. 59, which confers upon a stock corporation "the power to borrow money and contract debts" for lawful purposes, and to "issue and dispose of its obligations for any amount so borrowed," with detailed provisions as to the method of approval or consent of stockholders to a mortgage of corporate property, at length states: "When authorized by like consent, the directors, under such regulations as they may adopt, may confer on the holder of any debt or obligation, secured or unsecured, the right to convert the principal thereof within such period and upon such terms and conditions as may be fixed by the resolution of the directors conferring the right of conversion, into stock of the corporation." The contention is that so specific a grant of authority for an option to the holder under certain conditions implies a lack of authority except as so specified, and hence such a lack as to an option in favor of the corporate obligor. In support of this conclusion is quoted the 1934 opinion of an unnamed Deputy Attorney General—without citation—wherein there is no analysis of the background of the statute or of the possible reasons for the provisions contained in it. The possible abuses of such an option and the asserted rarity of its use are adduced as additional supporting reasons for the argument.

But the argument, aside from its reliance on reasons of policy, misses the point of the statute. The statute does disclose complete power in the corporation to borrow money and to "issue and dispose" of its obligations for the amount borrowed. As well stated by Mr. Justice Bischoff in Hyde v. Equitable Life Assur. Soc., 61 Misc. 518, 116 N.Y.S. 219, 227: "Having authority to borrow for the particular purpose, its choice of a means, neither corrupt nor prohibited, presents no question for judicial interference." The history of the statute and its precursors show that the restrictions it contains on certain forms of borrowing and of obligations were designed for the protection of the stockholders as a whole and as a limitation on formal or more general previously existing powers. Market & Fulton Nat. Bank of New York v. Jones, 7 Misc. 207, 27 N.Y.S. 677, affirmed 90 Hun 605, 35 N.Y.S. 1111; Glover v. Ehrlich, 62 Misc. 245, 114 N.Y.S. 992; and cf. Leffert v. Jackman, 227 N.Y. 310, 125 N.E. 446. The requirement of specific consent by the stockholders for an option of this kind to bondholders thus becomes easily explicable. In Wall v. Utah Copper Co., 70 N.J.Eq. 17, 62 A. 533, such an option to a bondholder was held illegal, as specifically interfering with the stockholders' pre-emptive right to new stock. Like statutory authority is suggested and looked to in Lisman v. Milwaukee, L. S. & W. Ry. Co., C.C.E.D.Wis., 161 F. 472, affirmed 7 Cir., 170 F. 1020, certiorari denied 214 U.S. 520, 29 S.Ct. 700, 53 L.Ed. 1065. Compare also Welles v. Chicago & N. W. Ry. Co., C.C.E.D.N.Y., 163 F. 330, affirmed 2 Cir., 175 F. 562. Such a requirement for the protection of stockholders' rights, necessary when the option is to the holder, has no place where the option is to the company, and where it is to be assumed that the

company in issuing stock for the bonds is doing so with full regard for the rights of the shareholders, who may be expected to enforce their own rights in the premises.[2] In fact, this substitution of new bonds is in effect one way of paying off and settling the old bonds not different in kind than was the issue of scrip here in payment of interest. Until the legislature has found such power not in the public interest, it is improper for a court to develop from so shadowy a base a prohibition on the otherwise broad power of a corporation to make contracts with reference to the borrowing of money.

This disposes of the basic issue; somewhat similar considerations apply to the contentions that fraud was shown in the representation of power to convert because the various conditions had not been complied with. The master held specifically to the contrary, discussing each matter with careful detail. The trustee suggests that the district court did not confirm this part of the master's report, and that we have not a sufficient record before us to pass upon the issues. (The record before us contains, as evidence beyond that quoted in the master's report, only certain stipulations of fact of the parties and certain printed exhibits.) This would be a valid objection to a decision against the trustee, but is not to a decision in his favor. After all, the burden rests upon appellants to show us grounds upon which the judgment below should be reversed. Appellants have brought up all the record they wished and have presented the case quite thoroughly on the merits. We do not think these proceedings should be further delayed against the remote chance—not suggested by appellants—that they may be able to point to some active fraud in fact upon the part of the Company which would overturn the master's finding. Of course, while these proceedings remain pending below, the district court will have authority to reopen orders previously entered, upon cause shown and in order to prevent manifest injustice. Cf. Rule 60(b); Kroell v. New York Am-

bassador, Inc., 2 Cir., 108 F.2d 294; Mohonk Realty Corp. v. Wise Shoe Stores, 2 Cir., 111 F.2d 287, certiorari denied 311 U. S. 654, 61 S.Ct. 47, 85 L.Ed. 418.

Hence we say only that given the facts upon which the master proceeded —that the conversion offer was made in good faith and was not fraudulent—we think his application of the law sound, and his conclusion that the conditions for conversion were fulfilled, correct. Thus, appellants contend that the condition against conversion unless all dividends on "Preferred Stock" had been paid was not fulfilled because a dividend on the "$4 Cumulative Preference Stock" due on May 1, 1932, had been paid in scrip, which, as the master found, was "received and accepted" by the holders. Whether or not this constituted payment, the master found that the Company did not use the terms "Preferred" and "Preference" interchangeably, but that in all its advertising and elsewhere it showed that these terms referred to distinct and different classes of stock. Indeed, there were several issues of each species. Appellants say, however, that in legal effect a preference stock is preferred, and that the usual and accepted meaning of the term must prevail. Nevertheless we believe the master's conclusion to be reasonable. True, the Company cannot rely upon some hidden meaning to the term, but the Company's instruments are entitled to be read, like all written documents, in the light of the facts and circumstances surrounding their framing. In the light of all the various obligations of this Company, each specifically named, it is hard to believe that here a holder would think not of the name used, but of the legal interrelationship of the various issues, which he could hardly understand or appreciate and which has not yet been completely dissected by the court. Again, appellants contend that the dividends on the preferred stock were illegally declared, since they impaired the capital of the corporation. As the master pointed out, the minutes of the meetings at which the dividends were declared disclosed that

---

[2] Compare Dunlay v. Avenue M Garage & Repair Co., 253 N.Y. 274, 170 N.E. 917, denying a pre-emptive right as to unissued stock, there held in the corporation's treasury, citing Frey, Shareholders' Pre-emptive Rights, 38 Yale L. J. 563, and Drinker, The Pre-emptive Right of Shareholders to Subscribe to New Shares, 43 Harv.L.Rev. 586; and People ex rel. New York Trust Co. v. Graves, 265 App.Div. 94, 37 N.Y.S.2d 900, affirmed 290 N.Y. 785, 50 N.E.2d 108, pointing out that there is no pre-emptive right even as to new stock where it is issued in exchange for property or services, to extinguish claims and debts against a corporation, or for any consideration other than cash. See also Berle, Convertible Bonds and Stock Purchase Warrants, 36 Yale L.J. 649, 660.

there were presented to the directors statements showing large surpluses, and the exercise of the option is conditioned only upon the payment in fact of the dividends. We agree with him that at least in the absence of evidence to show that the directors did not act in good faith in paying the dividends, the condition was validly fulfilled. Finally appellants claim that the option became invalid because by the time of its exercise the debtor had transferred its assets to the Associated Gas and Electric Corporation. Here, too, the master found specifically that the transfers relied on occurred later; and there is no evidence in the record affording a basis for challenging this result.

A final point concerns the validity of the subordination clause of the CO-AB's. Appellants claim that the exception from this clause of obligations convertible at the option of the Company into stock places these bonds on a parity with other bonds, such as the CDC's, which are not subordinated. Hence either these bonds are in fact not subordinated or the clause must be held unenforceable as inconsistent and ambiguous. We are content, however, to accept the conclusion of the district court, 53 F.Supp. at pages 113, 114, that these clauses were valid and enforceable in bankruptcy, In re Aktiebolaget Kreuger & Toll, 2 Cir., 96 F.2d 768; In re Geo. P. Schinzel & Son, D.C.S.D.N.Y., 16 F.2d 289, and that their requirements may be fully met by appropriate marshalling of assets, as was done, for example, in Bird & Sons Sales Corp. v. Tobin, 8 Cir., 78 F.2d 371, 100 A.L.R. 654.

What has been said above as to rights of COAB transferees applies equally to the rights of the Scrip Holders. If the original conversions were valid and the COAB's thus subordinated according to their terms, the scrip issued for unpaid interest must likewise be held subordinated according to their specific terms. It may be noted that the order below did not differentiate between original and transferee holders of the scrip; all are treated alike. This seems doubtful on the court's own theory. Since original holders of the converted bonds by assumed premise still retain whatever rights of action for misrepresentation they had, it would seem to follow that their rights of action also encompassed claims with reference to the scrip—a point of interest to those who still retained their bonds at least as to the amount of their claims, as well as to those who had parted with their bonds, but not their scrip, since presumably these latter are not barred from pressing their claims. It may be, however, that the proceedings below with reference to the compromise did take note of these distinctions. On the theory which we have followed, they become unimportant to the disposition of this appeal.

Order affirmed.