## EMPIRE DISTRICT ELECTRIC CO.
## v. RUPERT.

No. 14571.

United States Court of Appeals
Eighth Circuit.

Nov. 18, 1952.

Rehearing Denied Dec. 10, 1952.

Johnsen, Circuit Judge, dissented.

E. P. Dwyer, Jr., and A. E. Spencer, Jr., Joplin, Mo., for appellant.

William G. Boatright, Kansas City, Mo., for appellee.

Before THOMAS, JOHNSEN and RIDDICK, Circuit Judges.

THOMAS, Circuit Judge.

This is an action for damages for personal injuries. A judgment based upon the verdict of a jury for the plaintiff for $25,000 was entered, and the defendant appeals.

Jurisdiction of the federal court is based on diversity of citizenship and the amount involved.

The defendant owns and operates an hydroelectric plant on the White river in Taney County, Missouri. In connection with its business it owns and operates a dam on the river approximately 50 feet high from the bed of the river.

The plaintiff in his complaint alleged that on June 12, 1950, while navigating the lake above the dam in a small fishing boat with an outboard motor he, without any warning, was sucked, swept or thrown over the dam and severly injured. He charged that his injuries were proximately caused by the negligence of the defendant, in that (a) no warning signs were maintained to advise one approaching that surplus water was being spilled over the top of the dam and that there was danger of boats being sucked, swept or thrown over the top of the dam, and (b) that defendant failed to maintain any barriers, booms, chains, ropes or obstructions in front of the dam to prevent plaintiff and others navigating the river from being swept over the dam.

The defendant admitted the jurisdiction of the court and that plaintiff had been injured by going over the dam, denied any negligence, and alleged that plaintiff was guilty of contributory negligence which was the direct and proximate cause of his injury in that he had full knowledge and notice of the existence of the dam; that he knew and saw the situation and the danger existing and that he intentionally operated his boat too near the spillway and within the danger zone for the purpose of taking pictures, all in utter disregard of his safety.

It was stipulated that the waters of the White river at and above the dam constitute navigable waters of the United States; that the dam was constructed pursuant to an Act of Congress, see 33 U.S.C.A. § 401, and also Public Law No. 342, 36 U.S.Stat. 897, by defendant's predecessor; and that its authorized crest was 700 feet above sea level plus an additional 5 feet to be maintained by flashboards. The Act of Congress provided that the dam should be constructed and operated in accordance with the provisions of the Act approved June 23, 1910, entitled "An Act to amend an Act entitled 'An Act to regulate the construction of dams across navigable waters,' approved June twenty-first, nineteen hundred and six," 36 U.S.Stat. 593, 33 U.S.C.A. note preceding section 401. The latter Act provided that the plans and specifications for such dams were subject to the approval of the Secretary of War and the Chief of Engineers, and that " * * * it shall not be lawful to deviate from such plans or specifications either before or after completion of the structure unless the modification of such plans or specifications has previously been submitted to and received the approval of the Chief of Engineers and of the Secretary of War: * * *." The Act provided further that: "The persons owning or operating any such dam * * shall maintain * * * such lights and other signals thereon * * * as the Secretary of Commerce (and Labor) shall prescribe * * *."

The entire dam structure including the power house on the right is approximately 1300 feet long. The spillway section is about 593 feet long and 50 feet above the river bed. Water does not flow over the earth embankment on the left which is about 420 feet in length. A lookout observation place where the earth embankment joins the spillway section is about 20 feet higher than the spillway. The power plant at the right including the intake for the engines is 228 feet long. The lake impounded above the dam is approximately 15 miles long and is known as Lake Taneycomo, and the dam is commonly called the Powersite dam. Splashboards 26 inches high were in use over the entire length of

the spillway, and on the day of the accident the water going over the top of them was about 24 inches deep, which was equivalent to an elevation of 54.90 feet.

The plaintiff-appellee, Captain Oran H. Rupert, Infantry, U. S. Army, testified that in June, 1950, he obtained a leave of absence from his military duties. With his wife he went to Lake Taneycomo where they rented a cabin at Rockaway Beach on the lake. This was his first trip there, and he knew only that it was a recreational area.

For the six days prior to the accident on June 12th he fished practically every morning and evening and took pictures during the day. He had fished on lakes in small fishing boats before, had used outboard motors and was familiar with their operation.

Photography had been his principal hobby since 1940. June 12th was a beautiful day with the sun shining brightly, and he decided to take some pictures of the lake or of the docks. He had rented a boat for his use and mounted on it a 1½ horsepower Evinrude motor which he had brought with him on his vacation. He then started downstream for the purpose of viewing the lake and taking pictures. The first indication of the dam was the concrete structures on either side of the stream or lake. The structure on the right was large, and some sort of tower was on the left bank (going downstream).

No one had ever described the dam to him. He had no information that a 600-foot open spillway was across its center. He had never seen a dam with an open spillway through the center 600 feet and did not know that such type dam was constructed. He saw no warning signs of any kind, no boom across the lake in front of the structures, no floating buoys. No one had given him any warning, and he proceeded downstream with his motor half open, as was customary. There was no turbulence or current in the water. It was more turbulent upstream than immediately above the dam. He did not observe any current nor see any driftwood, twigs or leaves moving down the lake.

On his first trip down he did not observe the 600-foot open spillway and did not know it was a spillway until long afterwards. He proceeded toward the low concrete structure and when he got closer to the dam he made a short arc and reversed himself. He was in the middle third of the lake all the time, interested in what scene he could observe for the purpose of taking a picture. As he was approaching the dam, seeing what he could, he made a turn to the left, an arc, turned back and proceeded upstream a couple of hundred yards on the right side going up from the dam. He then let the motor idle, took the cameras from the case, and adjusted a filter to take a cloud picture. He testified "I intended to retrace my first course and take the picture, and that is the last thing I remember." He remembered nothing about going over the dam or the fall into the whirlpool below.

His testimony was not entirely consistent in every particular. In one part of his testimony, referring to his first trip down to the dam, he stated: " * * * at a distance of 25 feet above the spillway, seated in the boat, I do not recall ever seeing the river below the dam. I do recall seeing trees and foliage at a lower level than the top of the lake."

Again, he said: "On my first trip, anticipating the picture downstream, I saw the river below the dam at a distance—the distant scene was my interest and the river below the dam was a part of the scene."

Further, on cross-examination he testified that his last memory was when 200 yards upstream from the dam he turned his boat and started back down to the dam to take the picture of the scene below the dam. He remembered nothing that occurred thereafter, but, he said, " * * * I am confident that I re-did exactly what I did before.

"Q. But that is just a surmise? A. Yes, sir.

"Q. On the other hand, from as far as your memory, you might have steered and sailed right over? A. I may have, but I don't know. I know what my intentions were."

His next conscious memory was in the hospital.

Engineers familiar with several dams in rivers with open spillways testified in regard to the safety devices or the absence of them at dams with which they were familiar. Their testimony disclosed that at some such dams, booms, buoys, danger signs and lights are used to warn the public of danger or to prevent accidents whereas at many others no such warnings are used.

While there is nothing in the record to indicate when the dam was constructed, Leroy Smith, plant superintendent for the defendant, stated that lights have been maintained on the dam for the past 30 years. One red light is at each end of the spillway and white lights, like street lights, are maintained on the upstream side which illuminate the dam at night. No signs are maintained in the daytime, "* * * because you can see the concrete structure and would know there was a dam."

Lawrence Bartlett, general superintendent of the defendant, testified: "There is danger when water is flowing over the dam of anybody in a boat getting down very close to the dam where there is a flow or current. There were no warning signs of any kind or character maintained to warn people of the danger of approaching a given area near the dam * * * I * * felt that it [the danger] was self-evident to any one who might be on the water * * ."

At the close of the plaintiff's case and again at the close of all the evidence the defendant moved the court to instruct the jury to return a verdict for the defendant on the ground that the record failed to show a breach of lawful duty to the plaintiff on the part of the defendant, but that the evidence conclusively showed that the plaintiff was guilty of negligence which directly and proximately contributed to his injuries as a matter of law.

Both motions were overruled. The case was submitted to the jury upon instructions to which no exception is taken here. The only contention in this court is that these motions for a directed verdict, or one of them, should have been sustained by the court.

The instructions are important, therefore, only as tests to be applied to the testimony to determine whether or not it was sufficient to support a verdict for the plaintiff.

On the question of negligence the court instructed that "* * * if you find and believe from * * * the greater weight of the evidence * * * that there was a dangerous condition existing as a result of the impounding of the water, and that no notice thereof was given, no signs posted, that the plaintiff in the exercise of ordinary care on his part could not have seen or observed the dangers incident to the water flowing over that dam, and that as a result of that carelessness and negligence the boat in which he was riding, propelling, was caused to be sucked over the dam and he was injured, your verdict should be for the plaintiff.

"On the contrary, * * * contributory negligence in this case is pleaded as an affirmative defense, and just as the duty is upon the plaintiff to prove his case by the preponderance or greater weight of the evidence, so is the duty upon the defendant to prove the contributory negligence of the plaintiff by the same degree of care * * * if you find that the accident was a result of his own carelessness and negligence in failing to observe that which could have been observed in the exercise of ordinary care, then it would be your duty to find for the defendant.

"* * * As I stated to you, if there was a dangerous condition created and existing as a result of the impounding of the waters which could not be observed by a person in the exercise of ordinary care, it would then have been the duty of the defendant to provide such warning. But if the danger, if it existed, was so obvious and appreciable that a person in the exercise of ordinary care could have seen it and understood it, then the question of posting notices or placing buoys or other obstacles, would have no place in this case * * * it isn't required that one be given notice of that which can be seen and observed in the exercise of ordinary care * * * If it [the danger] was apparent to an ordinarily prudent person, the warning would make no difference * * * ."

The vital question for determination on this appeal is whether the evidence is such that this court can say as a matter of law that the plaintiff in the exercise of ordinary care could have seen and avoided the danger created by the dam; that the danger was apparent to an ordinarily prudent person.

 Under Missouri law the burden of proof was upon the plaintiff to plead and to prove that the specific negligence of the defendant was the proximate cause of his injury, Semler v. Kansas City Public Service Co., 355 Mo. 388, 196 S.W.2d 197; and upon the defendant to prove the alleged contributory negligence of the plaintiff. Brady v. St. Louis Public Service Co., Mo. Sup., 233 S.W.2d 841, 844. The rule in federal courts is that the burden of showing grounds on which a judgment should be reversed rests on the appellant. Elias v. Clarke, 2 Cir., 143 F.2d 640, certiorari denied 323 U.S. 778, 65 S.Ct. 191, 89 L.Ed. 622. And we are well aware that on appeal from a judgment rendered on a jury verdict in favor of plaintiff for personal injuries the testimony must be considered most favorably to support the judgment. St. Paul Hotel Co. v. Lohm, 8 Cir., 196 F.2d 233. Further, we realize that this court is "an appellate court sitting to review alleged errors of law, and not to try the action de novo." Twentieth Century Fox Film Corp. v. Brookside Theatre Corp., 8 Cir., 194 F.2d 846, 852. Nor can it be forgotten that "A jury does not have the power to render a capricious and arbitrary verdict in total disregard of the evidence." Wetherbee v. Elgin, Joliet & Eastern Ry. Co., 7 Cir., 191 F.2d 302, 310.

With all this in mind we find that the plaintiff admitted he knew the dam was there, but he did not know that the spillway was between the high walls on the ends of the dam; that he supposed it was on the right side of the river where the power house was seen to be. The crucial evidence to be considered is plaintiff's testimony that on his first trip down to the dam on June 12th, to determine where he would take a picture, when he approached to within 25 to 50 feet of the dam, looking over the top of it, he saw the river and trees below, and he then decided that was the scene which he desired to photograph. But he testified in substance that he did not appreciate the fact that water was pouring over the dam at that point; he considered it to be only the edge of the "pond." The fact was, however, that it was not the edge of a pond. That water was passing over the dam would necessarily have been evident to any observer. No part of the spillway was above the surface of the water; the water was less turbulent near the dam than it was further upstream. It is difficult to understand how any person could fail to see that the water was spilling over the top of the dam at that point. It is true that a person in these circumstances, unless he observed carefully, might not be able to estimate how much water was going over the dam or its velocity.

 It is well established Missouri law that "Where one is charged with the duty to look, and to look is to see, he must be held to have seen what looking would have revealed." Smith v. Kansas City Public Service Co., 328 Mo. 979, 43 S.W.2d 548; Weis v. Melvin, Mo.Sup., 219 S.W.2d 310; Branscum v. Glaser, Mo.Sup., 234 S.W.2d 626. And "The law is further well settled that 'a failure on the part of a plaintiff, where a duty to look exists, to see what is plainly visible when he looks, constitutes contributory negligence as a matter of law.'" State ex rel. Kansas City So. R. Co. v. Shain, 340 Mo. 1195, 105 S.W.2d 915, 918; Harding v. Triplett, Mo.App., 235 S.W.2d 112. And see, also, Clark v. Missouri Natural Gas Co., Mo.Sup., 251 S.W.2d 27.

 But, says counsel for plaintiff, the plaintiff on his second and fatal trip down the lake is presumed in the absence of evidence to the contrary to have exercised due care because of loss of memory, citing Stotler v. Chicago & A. R. Co., 200 Mo. 107, 98 S.W. 509, 521. In the cited case plaintiff was injured at a railroad crossing, and the court said that "Eugenia [the plaintiff] being unable to speak on her own behalf, being left by her injuries as though dead, and having no knowledge of the affair, she is entitled to certain presumptions in her favor, and those presumptions are that, in the absence of evidence to the con-

trary (because of the natural instinct of love of life), she did exercise due care."

In response to a like contention, Mr. Justice Lamm in Mackowik v. Kansas City, St. J. & C. B. R. Co., 196 Mo. 550, 94 S.W. 256, 262, said: " * * * presumptions have no place in the presence of the actual facts disclosed to the jury, or where plaintiff should have known the facts had he exercised ordinary care * * *." And he quoted the adage that "Presumptions * * * may be looked on as the bats of the law, flitting in the twilight, but disappearing in the sunshine of actual facts." Here it is not necessarily what the plaintiff saw and observed on his second trip to the dam, but it is what he should have seen and observed on his first trip. That is, should he not have observed the water going over the dam at that time and appreciated the danger, since he was bound to exercise the care for his own safety commensurate with the situation in which he found himself? The only excuse for such neglect is that at the time he was interested only in the view below the dam as presenting an attractive scene for a picture.

Further, his lapse of memory reached back only to the beginning of his second trip. He recalled with apparent clarity his observations on the first trip to the dam only a few minutes prior to the last trip. His failure to observe what was apparent and to appreciate the danger was carelessness. It was not a case of traumatic amnesia as in Knight v. Richie, Mo. Sup., 250 S.W.2d 972, or of retrograde amnesia as in Prewitt v. Rutherford, 238 Iowa 1321, 30 N.W.2d 141, in which cases doctors testified to the effect of shock on one's memory.

We cannot escape the conclusion that the plaintiff was contributorily negligent and that such negligence was the direct and proximate cause of his injury. As said by the Supreme Court of Missouri in Tietze v. New York, C. & St. L. R. Co., 250 S.W.2d 486, 488. "No one can assume there will not be a violation of the law or negligence of others and then offer such assumption as an excuse for failure to exercise care."

The judgment must, therefore, be Reversed.

JOHNSEN, Circuit Judge (dissenting).

I do not feel able to say as a matter of law at what point of proximity to the dam there existed the danger generally to boatmen, on the basis of all the possible affecting conditions which could obtain on Lake Taneycomo, of being drawn into and over the spillway. And without the establishment and posting of such a general danger zone by appellant, as a legal constant, based on all the possible affecting conditions and taking into account all the possible kinds of boats used on the lake, I no more feel able to declare judicially under the conditions which obtained on the specific occasion and the knowledge of them which appellee could have only from observation, at what point, in relation to such conditions and knowledge, appellee could reasonably have been expected to realize that he would be subjecting himself to this danger.

Without an established and posted general danger zone as a legal constant, the point of actual danger was a variable one, as a matter both of fact and of apparency, in that some of the factors by which it was controlled, such as volume of water going over the spillway, extent of existing current, and manifestations of flow, were not at all times the same.

Appellee testified that, on his first approach toward the dam, he proceeded to a point some 25 or 50 feet away and then turned his craft around to get his camera ready; that in making this approach there had been no feeling or suggestion of pull or tow upon the boat at any time; and that, while he knew, of course, that the river flowed generally into the lake and on beyond again, the lake itself had a placid appearance and was without any movement of twigs, driftwood or other debris indicative of a special current. There was evidence on the part of appellant that a movement of debris in the lake existed "under all conditions." There further was testimony by appellant's general superintendent that, under the specific conditions existing at the time of the accident, "a man in a rowboat who had never seen the place before—I believe the current of the water would move his boat to the

extent that he would feel it." He admitted, however, that, when an outboard motor was used, as appellee did, under the conditions which existed on the occasion, "he might not be able to detect from the current as to how much water was going over, or the velocity."

In so far, therefore, as the volume of water, the extent of current, and the manifestations of flow were material factors in relation to appellee's responsibility of knowing from observation how close to the dam he could prudently go, the facts as to the existing conditions and their observable significance were clearly, it seems to me, for the jury to resolve.

There also are other considerations shown by the evidence which I think tended to make the question of fixing the observational point of danger under the existing conditions one for the jury and not for the court. Thus, it appeared that appellant did not require its workmen to cross the lake in connection with their work at any certain point but allowed them to cross in varying proximity to the dam on the basis of the existing volume of water. But, while insisting that a boatman on the lake, inexperienced though he might be, should be sufficiently able to determine the volume of water at any time to know how close to the dam he could safely go, appellant apparently did not believe that this standard could be safely applied to its own experienced workmen, for, according to its plant superintendent, employees were not permitted to pick their point of crossing on the basis of observation, but "we have a river gauge which tells us the depth of the water over the spillway and we go upstream according to the depth of the water."

Another circumstance seems to me further to point up the impossibility of saying with legal absoluteness that an approach to within 50 feet of the dam (which distance is entitled to be taken on appellee's testimony in relation to a directed verdict) was necessarily at the time unsafe and should

have been known by appellee to be so. Photographs taken on the lake on behalf of appellant for purposes of the trial, which appellee agreed were made under conditions corresponding to those existing at the time of the accident, were taken from a boat in 75-foot proximity to the dam. If, on the existing conditions, it was safe as a matter of fact and apparency to approach within this distance to take pictures, it seems to me that it would be drawing a fine legal line to say that nevertheless no boatman was at all warranted in proceeding to a 50-foot proximity for such a purpose—and this though the observational elements might present the same apparent condition.

As I have said, I do not think that, on the varying conditions of the lake, both of fact and of apparency, it can legally be declared how close to the dam a boatman was warranted in going at any particular time. It is entitled to be borne in mind in this connection that no general danger zone, with posted warnings, taking into account all the possible elements and conditions which could exist, had been established by appellant. In the absence of such a legal constant, I do not believe that any possible basis exists, under the varying conditions which could obtain and the inabsolute possibilities of observational appreciation to which they might be subject, to hold that anyone who ran a motorboat to within a distance of 50 feet from the dam was necessarily guilty of contributory negligence.

If appellee's conduct was imprudent, it seems to me that that brand can in the circumstances only be placed upon it by the branding iron of fact, and not by the branding iron of law. I am unable to see in the variableness of the conditions, both of fact and of apparency, such absoluteness of realizable danger of being drawn into and over the spillway, at a distance of 50 feet from the dam, as would require the question of contributory negligence to be taken from the jury.