In re The DUPLAN CORPORATION,
Duplan Fabrics, Inc., Debtors.

Bankruptcy Nos. 76 B 1967, 76 B 1968.

United States District Court,
S. D. New York.

Dec. 15, 1980.

As Amended Dec. 18, 1980.

922

Alfred P. Slaner, trustee.

Shea & Gould, New York City, for trustee; Lonn A. Trost, Jacalyn F. Barnett, New York City, of counsel.

Curtis, Mallet-Prevost, Colt & Mosle, New York City, for United States Trust Co., Successor Indenture Trustee; John P. Campbell, Cormack K. H. O'Malley, New York City, of counsel.

Cravath, Swaine & Moore, New York City, for Chemical Bank; Gregory Markel, David Cohen, New York City, of counsel.

Zalkin, Rodin & Goodman, New York City, for Security Pac. Nat. Bank, North Carolina Nat. Bank and First Nat. Bank of Chicago; Richard S. Toder, Menachem O. Zelmanovitz, Henry Lewis Goodman, New York City, of counsel.

Nathan M. Fuchs, New York City, of counsel, for Securities & Exchange Commission.

Hahn, Hessen, Margolis & Ryan, New York City, for Gal-Lazare Group Senior Subordinated Noteholders; Gabriel B. Schwartz, Jerald E. Podair, New York City, of counsel.

Bader & Bader, New York City, for Debenture Committee; Albert Mayer, New York City, of counsel.

Landau, Berkowitz & Nostrand, New York City, for Schlesinger-Rothkopf Group of Senior Subordinated Noteholders; Marvin E. Landau, New York City, of counsel.

OPINION

KEVIN THOMAS DUFFY, District Judge:

## I. BACKGROUND

On August 31, 1976, the Duplan Corporation and Duplan Fabrics, Inc. [collectively herein "Duplan"] filed bankruptcy petitions in the Bankruptcy Court under Chapter XI Section 322 of the Bankruptcy Act. On October 5, 1976, the Bankruptcy Court granted the motion of the Securities and Exchange Commission [hereinafter "SEC"] to transfer the cases to Chapter X. The following day, Alfred P. Slaner was appointed Trustee in the reorganization of Duplan.

After less than three years of extraordinarily skillful divestiture of the debtor's losing operations, the Trustee duly filed with this court, on August 15, 1979, a proposal for a plan of reorganization for Duplan. On October 2, 1979, the Trustee amended his proposal to reflect a settlement agreement among the Indenture Trustee, Duplan and several interested banks. Hearings were subsequently held at which time Duplan, its creditors and stockholders were given the opportunity to comment on the proposal, and make proposals of their own.[1] On February 5, 1980, I entered an order which found the Trustee's plan worthy of consideration. As a result, the proposal was referred to the SEC for an advisory report thereon. On May 2, 1980, the SEC submitted its advisory report. Parties in interest have since submitted various memoranda commenting on the SEC's conclusions.

The SEC concluded that the Trustee's plan was feasible but not fair and equitable in limited respects to certain of Duplan's creditors. The plan would be fair and equitable, according to the SEC, if minor amendments are made. Various creditor groups have also suggested amendments. These suggestions relate to the valuation of Duplan and the allocation of cash and new stock to creditors. Upon consideration of the SEC's report and the comments from interested parties, I find the Trustee's plan, as proposed, is fair, equitable and feasible.

## II. BRIEF HISTORY OF DUPLAN

In the late 1960's Duplan established itself as an innovator in the development of

1. Hearings were held on October 22, 23, 24, 25 and 26, 1979; November 26 and 27, 1979; and January 14, 15 and 17, 1980.

new textile products. Following a period of lackluster profits while engaged in the texturing of synthetic yarns and conventional yarn throwing, the company embarked in 1967 on an expansion and diversification program. New plants were added and existing facilities expanded. Common stock, debentures and loans financed this expansion. These investments provided Duplan with increased capabilities in its existing operations and allowed it to enter the apparel and apparel component markets. New lines of yarn, production of bonded fabrics, dying of yarns and piece goods, carpet manufacturing, manufacturing of textile machinery, and wholesaling of double knit suits were among the items added to Duplan operations. As a result, Duplan's sales more than doubled between 1965 and 1969.

The decade of the seventies, however, brought less prosperous times for Duplan. Between 1970 and 1975, the company suffered dramatic losses. The double-knit industry, upon which the company's expansion relied so heavily, collapsed in this period. With the company's capitalization relying heavily on debt, Duplan went into default on August 1, 1976. Efforts to cure the default on various loans and indentures were to no avail and the debtors filed petitions under the Bankruptcy Act on August 31, 1976.

## III. TRUSTEE'S ADMINISTRATION

Shortly after he assumed his duties on October 6, 1976, the Trustee began a comprehensive investigation of Duplan's properties, liabilities, financial condition, and the desirability of continuing operations in the various divisions. This led to the liquidation of all components of the textile and yarn operations and the court-ordered sale of certain plants and equipment. The Trustee has continued, up to the present time, to attempt to make Duplan's remaining operations more efficient. Of the thirteen original operating entities that comprised Duplan a decade ago, only four remain: Wundies, Kickaway, Kitchener and Rochester Button. These entities are engaged in the manufacturing of apparel components, ladies' underwear and children's sleepwear.

As of September 30, 1979, consolidated assets have been valued at $61.6 million. Most of this is cash. Approximately $26.3 million of these assets consist of two operating divisions, Wundies and Rochester Button.[2] The balance consists of deferred payments for property sold, related tax benefits and various legal claims.

The principal legal claim is an antitrust suit by Duplan against Deering Milliken, a supplier of machinery used to process synthetic yarn. Duplan was successful in obtaining a verdict on liability.[3] The issue of damages remains to be tried. Duplan is presently claiming approximately $12 million in treble damages. Defendants in the action deny that damages are recoverable.

The major liabilities of Duplan consist of three forms of debt: term bank loans amounting to $38.4 million in principal, privately held subordinated notes totalling $6.1 million and publicly held subordinated debentures equal to $19.2 million. In addition, Duplan has outstanding approximately 2.6 million shares of common stock and about 8,000 shares of $4 convertible preferred stock, with a liquidation preference of $831,900.

In February, 1977, an adversary proceeding was commenced by the lending banks against the Trustee to claim security interests in Duplan assets. The Indenture Trustee representing the subordinated deben-

2. These assets have been recently expanded. On November 12, 1980, I signed an order permitting the Trustee to purchase the capital stock of Patent Molding Company and Wam Accessories, Inc. The addition of these companies to Duplan's operations bolsters Duplan's presence in the apparel component market. Patent Molding Company is a Tennessee corporation engaged in the manufacture of buttons.

Wam, a New York corporation, sells Patent's products. The total purchase price is $90,000. The combined net worth of the two companies as of May 31, 1980 was $209,410.

3. *Duplan Corp. v. Deering Milliken, Inc.*, 444 F.Supp. 648 (D.S.C.1977), *aff'd in part*, 594 F.2d 979 (4th Cir. 1979), *cert. denied*, 444 U.S. 1015, 100 S.Ct. 666, 62 L.Ed.2d 645 (1980).

ture holders subsequently intervened on the side of the Trustee. Objections and counterclaims were duly filed by the Trustee and the Indenture Trustee. Several motions and the discovery and examination of hundreds of documents led to negotiations to settle the claims. Eventually, the parties arrived at a settlement which is included in the Trustee's plan of reorganization.

## IV. SUMMARY OF TRUSTEE'S PLAN

The Trustee's plan provides that Duplan will continue to operate and own the capital stock of Wundies, Kickaway, Kitchener and Rochester Button. A board of directors will be appointed by the Trustee subject to court approval to manage the reorganized company.

In addition to providing for an operating structure, the plan provides for the distribution of available cash and new shares of stock of the reorganized company ["New Common Stock"] to the creditors.

The plan assumes there is approximately $30 million of cash available for distribution.[4] All administrative costs and tax claims are to be paid in full with cash. The balance of the cash, estimated at $27.6 million, will be distributed to various creditors, along with new common stock valued at $10 per share, in the following manner:

Trade Creditors[5] will receive cash equal to 40.8 percent of their claims and shares of New Common Stock equal in value to 41.1 percent of their claims.

The Senior Subordinated Notes Creditors will receive shares of New Common Stock equal in value to 100 percent of their claims.

The Subordinated Debentures Creditors will receive cash equal to 10 percent of their claims and shares of New Common Stock equal in value to 61.1 percent of their claims.

Due to the insolvency[6] of Duplan, the plan makes no provision for distribution of cash or stock to the prior stockholders of Duplan.

The proposal thus provides for the distribution of new common stock as follows:

| | |
|---|---|
| Trade Creditors | 3.16 percent |
| Bank Creditors | 29.87 " |
| Senior Subordinated Notes Creditors | 22.44 " |
| Subordinated Debenture Creditors | 44.53 " |
| Total | 100 percent |

The plan also incorporates the proposed settlement of the adversary proceeding brought by the lending banks against the Trustee. This settlement provides in essence for a release of the security interests claimed by the banks, and an offer of $6 million, consisting of cash and new stock, to those debenture holders who release their claims against the banks. The banks will retain that portion of the $6 million belonging to those debenture holders who do not execute a release.

## V. FAIR, EQUITABLE AND FEASIBLE STANDARD

The fundamental purpose of these reorganization proceedings is to establish Duplan as an economically sound business unit without abrogating the rights of creditors or stockholders. To that end, Chapter X of the Bankruptcy Act §§ 174, 221(2), requires that a reorganization plan be "fair, equitable and feasible" before the plan can be approved or confirmed by this court. Inherent in the "fair" and "equitable" standards is the doctrine of absolute priority. This doctrine provides that creditors and shareholders may participate in the debtor's assets only in accordance with their respective priorities, and that senior classes must receive full compensation for their claims before other classes can participate. *Consolidated Rock Products Co. v. DuBois*, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982 (1941);

---

**4.** Interest accumulated after September 30, 1979 raises the amount of available cash to more than $32 million. See SEC Advisory Report, p. 26.

**5.** Trade creditors with allowed claims of $3,000 or less, including those who elect to reduce

their claims to that amount, are to be paid in cash. All other trade creditors will receive cash and stock as indicated above.

**6.** The issue of insolvency will be discussed later in this opinion.

*Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939). Implicit in this rule is that stockholders cannot participate in a reorganization plan unless it is established that the debtor is solvent.

The feasibility of the Trustee's plan is not in doubt. For reorganization purposes, feasibility simply means that a plan must structure a debtor to insure its viability as a reorganized company. This includes providing the ability to service any debt included in the plan and providing enough working capital for continuation of the business. The late Judge Frank summarized the SEC's approach to the feasibility standard as follows:

> Among the most important aspects of sound structure, in the Commission's opinion, is a reasonably small percentage of debt and a substantial value behind the common stock equity. Much of the financial disaster of the past, in its opinion, has been due to top-heavy debts in corporate financial structures. Conversely, much wild speculation and market manipulation is encouraged by the existence of 'poker chip' equity securities with little or no value behind them.
>
> Thus, in reorganization plans we condemn too heavy a load of senior securities. This attitude is not inconsistent with our support of the rule of full compensation for senior claims .... On the contrary, both positions discourage trading on a thin equity .... [7]

Here, the Trustee's plan provides for a debt-free capital structure. The operating divisions today are self-supporting and no portion of accumulated cash is required for working capital.[8]

## VI. GOING CONCERN VALUE

Central to the entire "fairness" issue is the valuation of the reorganized company. For instance, valuation is necessary to determine solvency. Only if the value of Duplan's assets exceed its liabilities will shareholders be entitled to participate in the reorganization. Valuation is most important in applying the absolute priority rule, particularly in a case such as here where the creditors are required to receive stock for their claims. *See In re Interstate Stores*, 1 B.R. 755, 15 C.B.C. 634, 650 (Bkrtcy. S.D.N.Y.1978).

The value of a business is based on expectations of profits. *Protective Committee For Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968). To arrive at the value of a debtor's business, prospective earnings are capitalized at an appropriate rate. The Supreme Court has stated that valuation

> requires a prediction as to what will occur in the future, [and therefore,] an estimate, as distinguished from mathematical certitude is all that can be made. But that estimate must be based on an informed judgment which embraces all facts relevant to future earning capacity and hence to present worth, including, of course, the nature and condition of the properties, the past earnings record, and all circumstances which indicate whether or not that record is a reliable criterion of future performance.

*Consolidated Rock Products Co. v. DuBois*, 312 U.S. at 526, 61 S.Ct. at 685.

To assist in determining an appropriate valuation of Duplan, several expert analyses have been made available.

At hearings held to determine the valuation of Duplan, the Trustee presented Richard Fishbein of Bear Stearns & Co. as an expert witness. Bear Stearns & Co. is an investment bank retained by the Trustee to prepare a valuation report.

A group of subordinated noteholders, the Gal-Lazare Group, presented a valuation of the Duplan estate by First Manhattan Co.

---

7. Frank, "Epithetical Jurisprudence and the Work of the Securities and Exchange Commission in the Administration of Chapter X of the Bankruptcy Act." 18 N.Y.U.L.Rev. 317, 344–45 (1941) (footnotes omitted).

8. See Appendix B to SEC Advisory Report.

The Gal-Lazare Group also submitted two other valuations on Duplan's continuing operations: one from a consultant, Irving Schwartz, and another from an accounting firm, Babian Coyle & Co. [hereinafter "Coyle"]. The SEC Advisory Report also provides extensive analysis of the valuation of Duplan.

Although there exists a basic consensus among the interested parties on the components of valuation, there are serious disputes over the amounts of such components and the proper method of arriving at each.

## A. *Future Earnings and a Multiple*

The two principal components of valuation—future earnings and an appropriate multiple—provide the focus for the parties' dispute. Turning to the first component of going concern value, future earnings, the Trustee received an "informed judgment" from management regarding earnings for the years 1980 through 1983. These projections took into account an anticipated recession in 1980 and Wundies' expectations of entering new product areas in the near future. Expert analysis by Bear Stearns confirmed the validity of these projected earnings which average $2,890,000 per year.[9] The SEC Advisory Report accepts these conclusions.[10] On the other hand, the noteholders and their experts,[11] First Manhattan and Irving Schwartz, dispute the propriety of using average projected future earnings at all in arriving at going concern value. Before discussing the merits of this argument, I will pass to a discussion of the next component of going concern value: the price-earnings ratio or multiple.

In the marketplace, the price of a share of stock is generally considered to be a function of the earnings of a company mul-

tiplied by an appropriate number called the multiple. The multiple can be determined by dividing the price by the earnings per share. Since the price changes day-to-day, so does the multiple.

Thus, choosing the proper multiple in the present situation is an inexact task since there is currently no market for the new stock. To prevent the vagaries of the marketplace at any particular point in time from affecting the substantial interests involved, an historical perspective is appropriate.

The Trustee's choice of multiple is five and the SEC's is six. To arrive at a multiple of five, Bear Stearns analyzed the financial statistics of fifteen selected textile/apparel companies. The fifteen companies were selected from a group which Bear Stearns characterized as textile and apparel companies whose historical performance would be relevant to an investor considering an investment in the reorganized Duplan. None of the companies selected were principally engaged in button manufacturing. They were diversified textile companies of medium to large size.

The annual high and low market prices of the common shares of these companies for the years 1974 to 1978 were examined. Bear Stearns divided the average of these prices by the annual earnings per share for each of the fifteen companies. The average ratios of all companies for each year ranged from 5.1 to 6.3. Bear Stearns took into account the structural differences between the reorganized Duplan and several of the selected textile companies. Overall, "a remarkably stable" price/earnings ratio was observed. The company most comparable to Duplan and a direct competitor was

---

9. The Bear Stearns report stated,

> We were impressed by the market positions of both Rochester Button and Wundies, the business strategy and merchandising concepts of the present operating managements of both companies, and based on their continuation the achievement of the projections appear reasonable.

10. SEC Advisory Report, p. 20.

11. The noteholders' third expert, Coyle, concluded that total earnings, after tax, for the five years 1979–1983 would be $3 million less than the projections. This figure was based on a computation of income for Wundies and Rochester Button at rates of sales growth corresponding to historical rates in 1974–1978. Coyle also considered the recession expected in 1980 to be larger than the management expected, and that inflation and rising interests costs had been underestimated.

found to have an average ratio of 4.9. Based on this evidence, Bear Stearns concluded that a multiple of five was appropriate.

The SEC Advisory Report takes issue with this conclusion. Essentially, the SEC argued that the debt-free capital structure of the reorganized Duplan required a higher valuation than proposed by Bear Stearns. A company whose capital structure includes a significant amount of senior debt securities will have a value not identical to the value of their common stock. Of the fifteen comparable companies Bear Stearns examined, eight had debts in the 24–34 percent range, four in the 13–19 percent range and only two below 10 percent. In contrast, the new Duplan is debt free. Mr. Fishbein, the Bear Stearns' expert testified,

> You have a comparison of textile companies which suggest that five times would be that for a normal textile company, but this isn't a normal textile company. First it is a company with no debt; secondly, it's a company that is going to generate a lot of cash because it does not have any capital expenditures to make; it is going to generate a lot of cash because it has non-operating assets, which is going to bring cash back over the next few years. So you can't compare this per se with a normal textile company. It is certainly going to be worth some premium over what a normal textile company would sell at.

[Hearing Tr. pp. 349–50]

The SEC Advisory Report suggests a higher multiple of six. It reasoned that Duplan's desirable capital structure did not warrant choosing a multiple at the lower end of the average range of the fifteen companies.[12]

Expert witnesses for the noteholders, namely First Manhattan, I. Schwartz and Coyle, had different views on the choice of the multiple and their approach to going

concern valuation. Obviously, the choice of a multiplier is inextricably tied to the choice of an earnings figure when valuing a reorganized company. Essentially, the noteholders would have no objection to the use of a multiple of five provided it is applied to an historical earnings figure. The thrust of the noteholders' objections is that the Bear Stearns' analysis overvalues Duplan's continuing operations.[13] The noteholders argue that the calculation of the price earnings ratio of five was based on a study of present ratios of other companies. These ratios reflect an expectation by the marketplace of future earnings. By applying this multiplier to a projected average future earnings, the same expectations regarding Duplan's future have been considered twice. Thus, the noteholders suggest either lowering the ratio used, applying the ratio of five to historical instead of prospective earnings or applying the ratio of five to discounted earnings projections. The noteholders argue that the use of earnings projections raises several problems. Predicting the future is difficult at best in what is an admittedly volatile textile and apparel market. Also, the projections assume uncertain factors, such as unchecked inflation, early reversal of recessionary trends, uninterrupted services of key management personalities, and profitable diversification into new markets and product lines. The noteholders contend that, as a result, after-tax earnings per year are overstated by some $400,000.

■ The noteholders' reliance on historical earnings is misguided in the context of these proceedings. To value an ongoing business for Chapter X purposes, it is well settled that prospective earnings are capitalized. *Protective Committee v. Anderson, supra; Consolidated Rock Products Co. v. DuBois, supra.* Certainly past earnings provide a useful reference point from which to calculate present value and develop projections. To rely on the past exclusively,

---

12. SEC Advisory report, p. 22.

13. The Gal-Lazare noteholders question the credibility of the Bear Stearns analysis altogether because of an alleged interest Bear Stearns had in the outcome of these proceed-ings. I do not find that Mr. Fishbein's expert testimony was in any way affected by what the noteholders describe as an "interest" in the outcome.

however, would be misleading. If Duplan is to be transformed into a viable company, "freed from the heavy hand of past errors" its valuation must be based on its future earnings capacity as a reorganized entity. *Consolidated Rock Products Co. v. DuBois*, 312 U.S. at 526, 61 S.Ct. at 685. Therefore, the value of Duplan's new securities must be based on prospective income. Furthermore, the noteholders' contention that management's projections rely on unsupported assumptions regarding the economy in general and Duplan's position in the textile market in particular is without merit. Forecasts are a necessary part of the valuation process. Disagreement is therefore inevitable. Although mathematical certainty is not required in order for a valuation to be fair, an informed judgment is. I am satisfied that the Trustee's projections rely on a reasonable assessment of the reorganized company's position in the marketplace.[14]

■ In addition, the inclusion of inflation in the calculus of valuation is appropriate. Inflation will inevitably require Duplan to raise its prices as it keeps pace with rising costs. The marketplace necessarily enters this factor into its calculation of a company's value. It is therefore a necessary element of earnings projections. In this Circuit, even personal injury damage awards may be affected by future inflation rates. *See Doca v. Marina Mercante Nicaraguense, S. A. and Pittston Stevedoring Corp.*, 634 F.2d 30 (2d Cir. 1980).

The Trustee's expert, Mr. Fishbein, recognized that the arrival at a projected earnings figure cannot be divorced from the choice of a multiple when valuing the ongoing concern.[15] A ratio of five rather than four was chosen by him to account for what

he considered to be conservative earnings projections. I do not believe that the SEC's suggestion that the multiplier should be six adequately reflects some of the uncertainties which underly the Trustee's projections. The Trustee's suggested multiple of five appears more appropriate, despite the characteristics of its capital structure which were the basis for the SEC's conclusions.

### B. *Non-Operating Assets*

The valuation by the Trustee of non-operating assets—in particular, the tax loss carry forward and the Deering-Milliken suit—has also been contested by the noteholders. Any tax benefits produce value for the reorganized Duplan only to the extent that taxable income is realized. The Bear Stearns analysis cited two events which would require application of the tax loss carry forward thus reducing the amount available to offset the income from continuing operations. The first concerns a dividend from the sale of a former subsidiary payable to Duplan within fiscal 1980 and the second is the $6.5 million expected to be received from the Deering-Milliken suit.[16] Both sources of income would require Duplan to use up part of its available tax loss. By calculating the tax loss carry forward available after part is utilized for these other income sources, Bear Stearns arrived at a tax savings of $8,655,000. This tax savings has a present value of $6,130,-000.

The SEC Report includes the following tabulation of the tax savings, as computed by Bear Stearns, to account for a revised loss carry forward amount of $28,355,000 due to greater income in 1979.[17]

14. The noteholders' complaint that the Trustee's projections of earnings are too optimistic is undermined by the actual earnings achieved by Duplan in 1980. Bear Stearns' valuation depended on projections which predicted $1,965,000 in operating income for fiscal 1980 for the Wundies operations. [Tr. Exh. 38]. The actual figure for the year ended September 28, 1980 is $2,287,000. The projected 1980 operating income for Rochester Button was $1,460,000. [Tr. Exh. 41]. The actual income

for Rochester Button was $1,519,000 for the year ended September 28, 1980.

15. Hearings Transcript, pp. 341–43.

16. Hearings Transcript, pp. 326–27.

17. In January, 1980, the IRS revised the calculation of the loss carry forward after Duplan requested a ruling. From the above table, it is interesting to note that the full tax savings will be realized regardless of the recovery in the litigation.

– 000 omitted –

| Bear Stearns | Income Forecast | Carryover Used | Tax Saving | Present Value |
|---|---|---|---|---|
| Litigation – 1982 | $ 6,500 | $ 6,500 | $ 2,990 | $ 2,261 |
| 1980–1983 income | $21,405 | $18,817 | $ 8,655 | $ 6,130 |
| Revision of carryover | | (1,062) | (489) | (280) |
| Investment tax credit | | | 154 | 101 |
| Total | $27,905 | $24,255 | $11,310 | $ 8,212 |
| Laga Dividend – 1980 | 4,100 | 4,100 | | |
| Total carryover | $32,005 | $28,355 | | |

The Gal-Lazare noteholders believe the Bear Stearns' approach fails to take into account the uncertainties inherent in the management's projections of income, including the Deering-Milliken claim. The noteholders argue that there is a risk projected earnings will not materialize on schedule and therefore a substantial part of the carry forward will expire unused. The noteholders suggest an approach akin to that taken by First Manhattan. It is First Manhattan's belief that only 20 percent of the tax loss carry forward will result in actual tax savings. This analysis was based on a comparison of now profitable companies with operating loss carry forwards. It was found that the added value which investors placed on the carry forwards approximated 20 percent of the amount of the potential offset.

This analysis places too strong an emphasis on the present market value of Duplan's assets. In a reorganization, valuation of assets must be made in light of their potential value, in the same way that operating income is valued. The approach suggested by the Gal-Lazare noteholders ignores the longstanding method of valuation in reorganizations, that is, determining the present worth of future earnings. *Protective Committee, supra; Consolidated Rock, supra.*

The noteholders further argue that the damages to be realized in the Deering-Milliken suit have no market value as an asset to Duplan. Duplan has received a judgment on liability in the case and is awaiting a trial on damages. They are seeking approximately $12 million in treble damages. The noteholders contend that the potential proceeds from this suit should not be valued as an asset at all since presently both the amount and time of recovery are uncertain. At most, say the noteholders, the proceeds from the suit should be valued at 18 percent of the possible recovery. I recognize that uncertainties exist regarding the amount of recovery in this suit. Duplan's asserted damages, however, appear relevant to the legal theories upon which liability was found to exist. Therefore, I believe the Bear Stearns' valuation of net proceeds from the suit before taxes of $6.5 million is appropriate. After taxes, this would have a present value of approximately $2.7 million assuming recovery in 1982.

## VII. ABSOLUTE PRIORITY RULE AND OBJECTIONS OF PARTIES TO THE PLAN

The noteholders [18] contest the validity of the Trustee's proposal because it would distribute cash along with shares of new stock to the debenture holders while providing for compensation to noteholders in new stock only. The noteholders contend that the rule of absolute priority dictates that they should be compensated in a manner which reflects their superior rights. Thus, they dispute being placed in the same voting class as the debenture holders while being deprived of cash. The noteholders argue that at the very least they should receive their distribution either in appropriate debt instruments or preferred stock rather than new common stock. In the event the feasibility of the plan depends on a single class of equity securities, noteholders argue they should be given additional shares for the senior rights which they would thereby surrender. The noteholders suggest an additional distribution of stock measured at 10 percent of the face amount of their claims.

**18.** Two groups of noteholders have made presentations in these proceedings: Schlesinger-Rothkopf and Gal-Lazare.

These arguments raise two important issues which must be resolved: first, whether the terms of a settlement agreement between Duplan, the banks and the Indenture Trustee which are an integral part of the plan and provide for cash distribution to debenture holders meet the requirements of the absolute priority rule, and second, whether the classification of creditors and the distribution of cash and stock is fair and equitable.

## A. Adversary Proceeding

Compromise is a normal part of the reorganization process. Subject to judicial review, any settlements of claims are to be encouraged. Of course, because any settlement would become part of the reorganization plan, the requirement that the plan be "fair and equitable" applies to any settlement terms as well.

On February 8, 1977, four banks instituted an action against Duplan claiming that a credit agreement granted them a security interest in and lien upon substantially all of its fixed assets and pledged to the banks the stock of each of the Duplan subsidiaries. The property to which security interests are claimed include (a) $5.3 million from the proceeds of fixed assets with liens; (b) the remaining fixed assets, valued by the Trustee at approximately $3,000,000; (c) $1.77 million of factored accounts, now liquidated and available as cash for distribution under the plan; (d) all of the stock of Duplan's subsidiaries, and (e) monthly depreciation attributable to the fixed assets collateral used by the Trustee in the operations of the Debtors which the Trustee estimates at $4.4 million.

As the security interests claimed would take priority over any of the claims of other creditors, the settlement of these claims would effectively determine the size of the Debtors' estate available for distribution under the plan.

The Trustee denies the validity of the security interests asserted by the banks. This defense rests on the contention that the banks had knowledge of Duplan's financial distress at the time the agreements were signed. The financing arrangements and their subsequent administration involved improprieties which, the Trustee alleges, require that the liens be declared invalid. Also, the Trustee claims that approximately $900,000 in payments made to the banks within the four month period prior to the bankruptcy filing are voidable. Finally, the Trustee claims that approximately $2.5 million in offsets the banks made of monies in Duplan's bank account subsequent to the filing for bankruptcy were improper and should be voided.

If the banks were to win their suit, they would collect their claims from the collateral up to the value of the security independent of the subordination rights of other creditors.

The Indenture Trustee [19] for the subordinated debenture holders intervened in the adversary proceeding and asserted claims based essentially on the same facts relied on by the Reorganization Trustee. The legal basis for relief of each, however, differs. The Reorganization Trustee's contentions rest on legal and equitable restrictions upon the powers of a creditor dealing with a defaulting debtor. The successor Indenture Trustee relies on the fiduciary relationship of the same creditor to the debenture holders. Conduct permissible in one capacity may still create liability in the other.

## B. The Settlement

The parties, namely the banks, the Indenture Trustee and the Trustee, negotiated a settlement which extends to all issues in the case and provides for about an 84 percent recovery for the banks. The essential terms include:

**19.** Chemical Bank, one of four lenders to Duplan, was initially Indenture Trustee but was replaced in 1976 by United States Trust Company. An Indenture Trustee, as a fiduciary, has a direct relationship with the holders of the debenture and responsibilities to them which are independent of its status as lender to the debtor.

1. Waiver by the banks of their security interests.

2. Withdrawal by the banks and the Reorganization Trustee of their claims and counterclaims.

3. The Trustee recognizes $728,987 out of the $2.5 million claimed by the banks, and Chemical Bank waives its claims to setoff $1.77 million held in the factoring accounts.

4. The banks, including Chemical, are offering the debenture holders $6 million in settlement of their claims for breach of trust to them. The Indenture Trustee, in turn, releases its claims against the banks.

The subordination agreements relating to the status of the bank claims remain in effect and are recognized for determining the distribution under the plan.

▇ To approve the compromise reached by the parties, this court must find that its terms are "fair and equitable." Such a finding must be based on an objective assessment of the probabilities of success on the merits for each claim and the risks and costs to each party inherent in the litigation process. Basically, this requires a comparison of "the terms of the compromise with the likely rewards of litigation." *Protective Committee*, 390 U.S. at 425, 88 S.Ct. at 1163. This examination is not meant to be an in depth judicial investigation into the merits of the claims involved, but merely an inquiry as to whether the compromise falls "within the reasonable range of litigation possibilities." *In re Equity Funding Corp. of America*, 416 F.Supp. 132, 145 (C.D.Cal. 1975).

▇ At the hearings, evidence was proffered which demonstrates that the Reorganization Trustee has a legitimate claim against the banks, that litigation of those claims is likely to be protracted, and that what the estate receives under the settlement is as favorable as what it could potentially receive assuming any litigation was resolved in their favor. The settlement for this reason is fair and equitable. Its effect upon the reorganization, however, raises questions regarding the fairness of the overall plan. In particular, issues remain as to whether cash distribution under the plan and settlement properly take into account the subordination rights of noteholders, who were not parties to the adversary proceeding.

## C. *Objections To The Plan*

The plan provides for distribution of cash and common stock. This places an emphasis on the subordination rights of creditors and its effect on distribution. When the value of the estate is sufficient to provide for participation for subordinated creditors, the effect of that subordination is to capture for senior creditors cash that without subordination would be shared equally among creditors. *See Elias v. Clarke*, 143 F.2d 640, 647 (2d Cir.) *cert. denied* 323 U.S. 778, 65 S.Ct. 191, 89 L.Ed. 622 (1944). The senior creditors will also receive any stock necessary for them to be fully compensated. Any excess is allocated to the subordinated creditors.

The distribution of stock and cash under the Trustee's plan, and the effect of creditor subordination rights on the amounts to be received by each class of creditors, is shown by the following table presented by the Reorganization Trustee.

(000 omitted)

| CLASS OF CREDITORS | NUMBER OF CREDITORS | ESTIMATED CLAIMS ALLOWED | DISTRIBUTION BEFORE SUBORDINATION | | |
|---|---|---|---|---|---|
| | | | CASH | STOCK | TOTAL |
| Administrative Creditors | — | 2,200 | 2,200(100.0) | | 2,200(100.0) |
| Tax Creditors | — | 200 | 200(100.0) | | 200(100.0) |
| Small Creditors | 1200 | 500 | 500(100.0) | | 500(100.0) |
| SUBTOTAL | | 2,900 | 2,900(100.0) | | 2,900(100.0) |
| Bank Creditors: | | | | | |
| Chemical (approx.) | 1 | 11,377 | 4,643( 40.8)* | 4,663(41.0) | 9,306( 81.8) |
| Other Bank Creditors | 3 | 27,008 | 11,022( 40.8) | 11,071(41.0) | 22,093( 81.8) |
| Average | 4 | 38,385 | 15,665( 40.8) | 15,734(41.0) | 31,399( 81.8) |
| Trade Creditors ** | 125 | 2,100 | 858( 40.8) | 860(41.0) | 1,718( 81.8) |
| Senior Subordinated Notes Creditors | 24 | 6,104 | 2,491( 40.8) | 2,502(41.0) | 4,993( 81.8) |
| Subordinated Debentures Creditors | 1500 | 19,814 | 8,086( 40.8) | 8,104(41.0) | 16,190( 81.8) |
| SUBTOTAL | | 66,403 | 27,100( 40.8) | 27,200(41.0) | 54,300(81.8) |
| TOTAL | | 69,303 | 30,000*** | 27,200 | 57,200 |

\* Less amount in Factoring Account

\** Excluding Small Creditors

\*** Includes amount in Factoring Account

| DISTRIBUTION GIVING FULL EFFECT TO SUBORDINATION | | | DISTRIBUTION PURSUANT TO PROPOSED PLAN | | |
|---|---|---|---|---|---|
| CASH | STOCK | TOTAL | CASH | STOCK | TOTAL |
| 2,200(100.0) | | 2,200(100.0) | 2,200(100.0) | | 2,200(100.0) |
| 200(100.0) | | 200(100.0) | 200(100.0) | | 200(100.0) |
| 500(100.0) | | 500(100.0) | 500(100.0) | | 500(100.0) |
| 2,900(100.0) | | 2,900(100.0) | 2,900(100.0) | | 2,900(100.0) |
| 7,778( 68.4)* | 3,589(31.6) | 11,377(100.0) | 7,191( 63.2)* | 1,704(15.0) | 8,895( 78.2) |
| 18,464( 68.4) | 8,545(31.6) | 27,008(100.0) | 17,070( 63.2) | 6,420(23.8) | 23,490( 87.0) |
| 26,242( 68.4) | 12,143(31.6) | 38,385(100.0) | 24,261( 63.2) | 8,124(21.2) | 32,385( 84.4) |
| 858( 40.8) | 860(41.1) | 1,718( 81.8) | 858( 40.8) | 860(41.1) | 1,718( 81.8) |
| –0–( 0.0) | 6,104(100.0) | 6,104(100.0) | –0–( 0.0) | 6,104(100.0) | 6,104(100.0) |
| –0–( 0.0) | 8,093( 40.8) | 8,093( 40.8) | 1,981( 10.0) | 12,112( 61.1) | 14,093( 71.1) |
| 27,100( 40.8) | 27,200( 41.0) | 54,300( 81.8) | 27,100( 40.8) | 27,200( 41.0) | 54,300( 81.8) |
| 30,000*** | 27,200 | 57,200 | 30,000*** | 27,200 | 57,200 |

Under the proposed plan, debenture holders receive stock valued at about $4 million which they would not otherwise receive if the plan strictly followed creditor subordination rights. In the settlement, which is part of the Trustee's proposal, the banks—Duplan's largest group of creditors—have waived their liens and setoffs and given to the debenture holders $2 million in cash and $4 million in stock. This is in consideration of the release by the Indenture Trustee to claims against the banks.[20] The noteholders would not receive this portion of the stock going to debenture holders pursuant to their subordination rights. The trade creditors are not subordinated to anyone and receive their full pro rata share of the estate.

The SEC in its Advisory Report concludes that the Trustee's plan is feasible, but in

20. The $4 million in stock would be received by the debenture holders even if some of the stock was treated as part of a settlement of the estate's claims against the bank.

limited respects it is not fair and equitable to Duplan's creditors. Aside from revisions in the valuation which have already been discussed, the SEC proposes two minor amendments to the Proposal. The first suggestion relates to those debenture holders who do not approve of the settlement. There is presently no procedure for a debenture holder to vote for the plan with respect to his claims against the debtors but to decline the settlement and preserve his claim against the bank. Under Chapter X, if debenture holders holding two-thirds in amount of the claims vote for the plan, the plan is binding upon the entire class. Any dissenters will receive their share of the $8.1 million in common stock that the plan provides for them as creditors of Duplan, but their share of the $6 million settlement would be kept by the banks. This would be an effective forfeiture of the recovery by the dissenting debenture holders. The SEC suggests that the banks distribute any funds they retain to dissenters when the time for bringing suit has run out. In making this recommendation, the SEC is acting properly as advocate for the public debenture holders. But this would permit these debenture holders to have two bites out of the apple—which under the bankruptcy laws has already been left less than whole and unable to sustain the entire class of creditors.

The second suggestion relates to the distribution of $2 million in extra cash made available primarily from interest income earned since September, 1979.[21] As already explained, the noteholders' pro rata share of available cash was reduced under the plan

from 41 percent to zero. Meanwhile, the debenture holders have retained 10 percent of their pro rata share of cash. The SEC recommends that in fairness to the subordinated noteholders, the settlement should be renegotiated to provide for the distribution of the entire extra $2 million to the noteholders. The effect of distributing the additional cash will be to pay a larger part of the debt in cash and reduce by $2 million the amount of stock paid out.[22]

The percentage of claims to be received in stock by each creditor group will depend on the value assigned to the new stock. Any changes in the amount of cash to be allotted noteholders would involve a reciprocal shift of cash and stock between the banks and noteholders, but would not otherwise change the outcome. As a result, there is no danger, as was suggested by one of the parties, that the noteholders could be compensated for more than 100 percent of their claims.

The Trustee, noteholders and Indenture Trustee all disagree with the suggested amendments to the plan made by the SEC. The noteholders argue that the SEC Report does not give sufficient weight to the rule of absolute priority. According to the noteholders, the $2 million cash settlement that is to be received by debenture holders should go to noteholders by virtue of their more senior status. Essentially, they argue that had they participated in the settlement they would have been entitled to up to $2½ million in cash. Why, they ask, are they the only creditor group which does not receive cash? At the very least, the notehold-

---

**21.** The pro forma cash at September 30, 1979 was $30,643,000. The working balances of the operating divisions were $1,227,000, leaving $29,416,000 available for distribution. All of the available cash is in interest bearing accounts or certificates, at notes ranging in January, 1980 from 10 percent to 14¼ percent. Since the operating divisions are self-supporting, none of the accumulated cash is required as working capital for these divisions. This includes interest income which for the six months ended March 31, 1980 is forecast as $1,677,000. Earnings on the January balances were estimated at the rate of $300,000 a month. Allowing for compounding and the interest on

the installment receivables, about $2.6 million will be added from this source by June 30, 1980. Adding 2.6 million of post September 30, 1979 interest to the $29.4 million of September 30, 1979 cash and equivalent, produces $32 million of available cash, rather than $30 million proposed by the plan.

**22.** This distribution assumes that trade creditors would receive their pro rata share of 3.16 percent of the additional cash, that the noteholders would receive 20 percent of their claims in cash and the balance of available cash would go to the banks by virtue of the subordination agreements.

ers argue entitlement to a new form of debt instrument or preferred stock in lieu of new common stock of the reorganized Duplan.

The Indenture Trustee argues that the principles of equitable subordination operate to deny the noteholders any right to the cash settlement. Also, the noteholders are the only parties receiving 100 percent of their claims and, moreover, they did not choose to participate in the adversary proceeding. For these reasons, the Indenture Trustee concludes that the noteholders are not entitled to any additional compensation, including the $2 million in extra cash that the SEC suggests should be transferred to noteholders. This cash could be used to strengthen Duplan to the benefit of all parties, especially the noteholders who will be receiving new Duplan common stock.

■ Having considered the arguments of the parties and the recommendations of the SEC, I conclude that the plan, including the settlement, is fair and equitable.

■ Section 221 of the Bankruptcy Act requires me to confirm a plan if I am satisfied the plan is fair and equitable; the Act does not require the plan to be the fairest and most equitable alternative. For this reason, the noteholders' arguments are unavailing. The noteholders will be receiving 100 percent of their claims in stock that has been valued conservatively. The risk which they argue they alone are exposed to is indeed small under the circumstances. Duplan in its reorganized form is financially sound; its prospects for growth and potential as a takeover target are very good. The noteholders nonetheless argue that the doctrine of absolute priority entitles them to cash which is going to debenture holders pursuant to the settlement. I understand their desire to receive cash rather than new stock; the settlement, however, was a product of long negotiations. The mere fact that a subordinated creditor group receives cash does not warrant destruction of a negotiated settlement and its exclusion from a reorganization plan. The "absolute priority" rule requires that no class of creditors or stockholders can participate in any of a debtor's assets until all claims of creditor

senior to the class in question have received full compensation for the value of their claims. *Consolidated Rock Products Co. v. DuBois, supra; Case v. Los Angeles Lumber Products Co., supra.* Under the circumstances, I believe the noteholders are receiving adequate compensation for their claims, and for the loss of their senior rights as noteholders. The noteholders are the only group to receive 100 percent of their claims. Even with the cash settlement, the debenture holders will be receiving only 71 percent of the value of their claims. The long standing rule on compensation to creditors is clear:

If the creditors are adequately compensated for the loss of their prior claims, it is not material out of what assets they are paid. So long as they receive full compensatory treatment and as long as each group shares in the securities of the whole enterprise on an equitable basis, the requirements of 'fair and equitable' are satisfied.

*Consolidated Rock Products Co. v. DuBois,* 312 U.S. at 530, 61 S.Ct. at 687.

The noteholders press their argument by stating that the record does not reflect any evidence as to the nonfeasibility of distributing cash or more senior securities to the noteholders. The need for such evidence is not necessary here. There is no question that the present proposal is feasible. The plan appears sound and provides "reasonable assurances that the reorganized enterprise will operate and will not so far as foreseeable result in the necessity of another reorganization with its attendant expense and injury to investors." SEC Holding Company Act Release no. 2042 (1940). *In re Inland Paint and Light.* In light of the feasibility of the Trustee's proposal and its compliance with the absolute priority rule, it is not necessary for me to entertain different permutations of compensation to noteholders.

A final point to be addressed in passing on the fairness of the Trustee's plan regards the classification of creditors. The nature of a creditor's claims establishes his rights as against other creditors. The fair-

ness of a plan may depend on its treatment of these rights when classifying creditors. In addition, classification provides the vehicle for implementing the acceptance procedure specified by the Bankruptcy Act. This procedure requires each class of creditors to approve the plan. If the creditors of each class holding at least two thirds in amount of the allowed claims of that class vote for the plan, the plan is accepted.[23] The Bankruptcy Act affords the court much flexibility in classifying the claims. *Scherk v. Newton*, 152 F.2d 747, 751 (10th Cir. 1945).

The Trustee's plan places the banks, trade creditors, senior subordinated notes creditors and subordinated debenture creditors in the same class as general creditors. The banks have surrendered their secured status in the settlement agreement. As a result, all four groups are clearly unsecured creditors. The noteholders, however, object to being classified in the same group with subordinated creditors. They argue that their rights are distinguishable enough to require different treatment under the plan. To remedy any disenfranchisement of the noteholders, the SEC has suggested that this court direct that acceptance votes of the four groups of general creditors be counted separately. The Gal-Lazare noteholders insist this suggestion does not go far enough to alleviate the problem.

Under the Trustee's plan, no other unsecured creditor group, including the banks, comes out as well as the noteholders. As earlier stated, the noteholders' recovery of 100 percent of their claims adequately accounts for their subordination rights. Further classification appears unnecessary. "The fact that [unsecured] claims may take various forms—as, for example, notes, accounts, written contracts, torts or the like—will not ordinarily compel separate classification since an unsecured indebtedness or liability is the common denominator of all." 6 Collier on Bankruptcy, § 9.13(1), p. 1620 (1978). As a result, it is not necessary to create an exception to the bankruptcy laws and allow each group to pass separately on the acceptability of the plan.

---

**23.** See Section 179 of the Bankruptcy Act, 11 U.S.C. § 579.

## VIII. MISCELLANEOUS

Several other matters raised by the parties must be addressed. First is the SEC's suggestion that "piggyback" rights granted the banks should be extended to all new shareholders. I decline to implement this suggestion. Such piggyback rights were specifically bargained for by the banks in the settlement negotiations and extending those rights to all stockholders would impose an unnecessary burden on the reorganized Duplan. For the same reason, preemptive rights granted the banks should not be extended to all new shareholders.

Second, I have received several letters from stockholders reminding me of their investment in Duplan and their exclusion from the plan. Unfortunately, I cannot change the fact that the debtor is insolvent, nor the fact that the law excludes shareholder participation in a reorganization plan where insolvency exists. I recognize that stockholders have invested large sums of money into a company whose prospects now seem bright. For many stockholders, that investment constituted a major portion of their savings. But as anyone who purchases stock understands, their investment is not guaranteed. Furthermore, it is clear that creditors of the company must come before stockholders when distributing assets in reorganization under the bankruptcy laws. If this were not so, it would be impossible for even the healthiest of companies to raise needed capital. The fact remains that despite the new Duplan's encouraging earnings figures, there are not enough funds to pay creditors. Regrettably, the Trustee's plan must exclude former stockholders of Duplan.

In sum, the Trustee's plan as proposed is fair, equitable and feasible and will be confirmed.

Settle order.