**ACLI INTERNATIONAL COMMODITY SERVICES, INC., and A.C. Israel Enterprises, Inc., Plaintiffs,**

v.

**BANQUE POPULAIRE SUISSE, Advicorp Advisory and Financial Corporation, S.A., and Naji Robert Nahas, Defendants.**

No. 82 Civ. 1058 (ADS).

United States District Court,
S.D. New York.

Nov. 20, 1984.

Rogers & Wells, New York City, for plaintiffs; William R. Glendon, Guy C. Quinlan, James M. Lane, New York City, of counsel.

Arnold & Porter, Washington, D.C., Gilbert, Segall and Young, New York City, for defendant Banque Populaire Suisse; Brooksley Born, Alexander E. Bennett, Lawrence V. Stein, Douglas L. Wald, Daniel R. Waldman, Washington, D.C., Bernard J. Rosenthal, Richard A. Setterberg, New York City, of counsel.

Breed, Abbott & Morgan, New York City, for defendant Naji Robert Nahas; Noah Nunberg, Thomas W. Kelly, New York City, of counsel.

## OPINION AND ORDER

SOFAER, District Judge:

A.C. Israel Enterprises, Inc., and ACLI International Commodity Services, Inc. (collectively, "ACLI"), instituted this action for fraud against Banque Populaire Suisse ("the Banque"), its alleged agent Advicorp Advisory and Financial Corporation, S.A. ("Advicorp"), and Naji Robert Nahas ("Nahas"). Plaintiffs seek $20,100,000 in damages. ACLI alleges that defendants conspired to evade limits set by ACLI and the Commodity Exchange, Inc. ("Comex") on the extent to which any individual customer may trade in silver futures contracts. ACLI claims resulting losses of over $28 million, of which only $8 million has been repaid.

As part of its business as a commodities broker, ACLI places orders on Comex, a silver futures market, for customers wishing to trade in silver futures contracts. If an ACLI customer fails to make payment on orders executed on its behalf, ACLI is liable for the default under Comex rules. Amended Complaint ¶ 11 ("Complaint") ACLI seeks to limit potential losses when trading in the fluctuating silver futures market by imposing limits on the number of futures contracts which any one customer may hold. *Id.* ¶ 13. These restrictions help ensure that "no one customer will unduly expose [ACLI] in the event of default." *Id.* ACLI also requires each of its customers to agree in writing that no one other than the customer has any interest in its account. *Id.* ¶ 12. This helps lessen the risk that a customer is "using nominee accounts to conceal his ownership and/or control of futures contracts in excess of the number [ACLI] would otherwise permit him to trade." Complaint ¶ 12. Comex also sets its own limits on the number of silver futures contracts held by any individual.

ACLI claims that Advicorp, acting as an investment advisory service to the Banque, introduced a series of eleven accounts to ACLI. Beginning on January 23, 1979, an account was opened for Litardex Traders, Inc. with Mr. Nahas listed as its president. ACLI Memo in Opposition to Banque Motion to Dismiss the Complaint at 5 ("ACLI Memo I"). Then, ACLI contends, on February 14, 1979, another account was introduced to ACLI in New York in the Banque's name; ACLI also asserts that between February 15, 1979 and January 21, 1980, the Banque and Advicorp introduced nine other accounts to ACLI's affiliate in Geneva, Switzerland, to be approved by ACLI in New York, in the names of Rene Maret, Jean-Jacques Bally, Paul Bisoffi, Pierre-Alain Hirschi, Antoine Achkar, Selim Gabriel Nassif, Emir Fayez Chehab, Francisco Javier Benedi-Garcia, and the corporation Imovest Inter, S.A. Complaint ¶¶ 20–21.

In September 1979, the Commodities Futures Trading Commission (CFTC) issued a "Special Call" to the Banque to determine on whose behalf the Banque was trading. When the Banque refused to provide this information, the CFTC brought suit against the Banque under the Commodity Exchange Act ("the Act"), 7 U.S.C. §§ 9 and 13b (1976). *In the Matter of Banque Populaire Suisse*, Comm.Fut.L.Rep. (CCH) ¶ 21,255 (CFTC 1981). As a result of that action, the Banque was ordered in 1981 to cease and desist from further violation of the Act and was suspended from trading on all United States contract markets for 90 days. *Id.* at 25,257. ACLI asserts that it was unaware of the CFTC's investigation of the Banque.

Plaintiff claims that in the fall of 1979, ACLI and Comex had also become concerned about the large number of silver futures contracts acquired by the Banque, and that Comex had become concerned about Nahas' contracts as well. They claim to have begun imposing restrictions on the Banque and Nahas' trading in October and November of 1979. By late November, ACLI asserts that it had begun liquidating the silver futures positions held in the Banque's name, and that the Banque had transferred most of its account to ContiCommodity Services, Inc. ACLI Memo I, at 7.

ACLI alleges that the Banque, Advicorp, and Nahas devised a scheme, at some undetermined date, whereby they would use the remaining ten accounts carried by ACLI to continue trading in greater amounts than permitted. ACLI claims that the ten account holders, although representing that they were acting as individuals and that no one else had any interest in their accounts, were in reality "nominees" of Nahas, the Banque, and Advicorp and that these three entities actually controlled all of the accounts. Complaint ¶ 25.

From January to March 1980, the price of silver dropped from roughly $50 per ounce to less than $11 per ounce. Despite representations allegedly made by Advicorp's officers Jean-Jacques Bally and Pierre-Alain Hirschi that Advicorp's customers were solvent, the ten accounts defaulted in an aggregate amount of over $28 million, and ACLI was required to pay Comex that amount. Complaint ¶ 29. ACLI contends that had it "been aware that these accounts were mere nominees" of Nahas, the Banque, and Advicorp, opened for the purpose of exceeding position limits, ACLI would not have accepted these accounts and thus would not have lost $28 million. *Id.* It further claims that through its introduction of the ten "nominee" accounts, Advicorp was the "vehicle for the fraudulent trading" and that the Banque in turn had extensive control of Advicorp's activities. ACLI Memo in Opposition to Banque Motion for Summary Judgment or a Separate Trial at 4, n.*. ("ACLI Memo II").

After learning of Nahas' involvement with these ten accounts, ACLI asserts that it entered into settlement negotiations with Nahas' representatives to recover the debit balances on these ten accounts receivable. Complaint ¶ 30. ACLI's representatives at the negotiations included Henry Maringer, its President and Chief Operating Officer;

Herbert Stoller, an attorney from the law firm of Curtis, Mallet-Prevost, Colt & Mosle; and Jean-Louis Blomme, head of ACLI's London office. Julius Katz, now ACLI's Chairman of the Board and in 1980 its Senior Vice President, was periodically consulted, as was A.C. Israel. At the end of May 1980, Chester Grant of the law firm of Rogers & Wells replaced Herbert Stoller and his firm. Representing Nahas were Irwin R. Robinson and Joseph Getraer, both attorneys from Rosenman, Colin, Freund, Lewis & Cohen; and Professor Ibrahim Fadlallah, also an attorney. The Banque played no part in any of the negotiations.

Mr. Blomme of ACLI testified that on March 26, 1980 he was assured by Nahas' representatives that ACLI "would not suffer any loss because of the silver situation." Blomme Tr. 25, *reprinted in* ACLI Memo II, at 4. ACLI further alleges that on April 12 an agreement was reached which would have resulted in ACLI's receiving full compensation. *Id.* ACLI thereafter submitted to Nahas' representatives a draft agreement which would have settled the ten accounts. *See* Banque Memo in Support of Motion for Summary Judgment or Separate Trial at 7 ("Banque Memo"). A meeting was convened on April 16, 1980, the substance of which is in great dispute. ACLI claims that Nahas falsely represented that he was unable to honor the settlement agreement, because "he did not have sufficient assets to pay more than $8 million in settlement." ACLI Memo in Opposition to Banque Motion for Accelerated Separate Trial at 3 ("ACLI Memo III"). ACLI's attorney Stoller claims he was told that it was beyond Nahas' "financial capabilities to perform, that there were many claims against Mr. Nahas ..." (Stoller Tr. 119–20, *reprinted in* ACLI Memo II, at 25), and that "there wasn't enough to go around" (Stoller Tr. 124, *reprinted in* Second ACLI Memo at 26). Nahas' attorney, Robinson, denies that he ever represented that $8 million was all Nahas was capable of paying, but rather said that $8 million was all Nahas was *willing* to pay. Robinson asserts that at most he stated that Nahas "was not prepared" to offer ACLI more than $8 million.

During the negotiations, ACLI contends that it undertook an investigation into Nahas' assets but could obtain no reliable information. Allegedly persuaded that Nahas' representations were accurate, and relying on them, ACLI agreed to settle for $8 million. On April 28, 1980, a written agreement was executed between ACLI and Compania Financiera Caldas, S.A. ("Caldas"), a Panamanian corporation apparently owned or controlled by Nahas. ACLI states that the agreement was made with Caldas rather than Nahas because Nahas did not want his name to appear on the settlement documents.

ACLI agreed to "sell, transfer and assign" to Caldas "all the commodity futures account deficit balances (i.e., accounts receivable) owed to ACLI by the following persons and corporations: Antoine Achkar, Selim Gabriel Nassif, Emir Fayez Chehab, Litardex Traders, Inc., Imovest Inter, S.A., Jean-Jacques Bally, Paul Bisoffi, Pierre-Alain Hirschi, Rene Maret." Banque Memo, Ex. 1 (punctuation added). These nine individuals were referred to collectively as the "Debtors." Banque Memo, Ex. 1. Originally, Francisco Javier Benedi-Garcia was also included on this list, but his name was later deleted. *Id.*

In exchange for transferring the accounts receivable, ACLI was to receive $1 million initially and the balance of $7 million plus interest within 90 days. ACLI executed releases in favor of Caldas, Nahas, and Antoine Achkar. A standard integration clause stated: "This Agreement constitutes the entire understanding among the parties and supersedes all prior agreements or understandings among the parties. No waiver or modification of the terms hereof shall be valid unless in writing signed by the party to be charged and only to the extent therein set forth." *Id.*

To implement the agreement, ACLI executed an assignment on July 23, 1980, whereby it assigned to Caldas "all of its right, title and interest in and to each of

the accounts receivable" listed in the agreement. Furthermore, ACLI assigned, transferred, and sold to Caldas "all of its right, title and interest in and to each of the Accounts, including all rights, claims and causes of action that ACLI has against the owners of the Accounts (the 'Assigned Rights')." ACLI also covenanted not to bring "any form of action whatsoever against the owners of the accounts arising out of, or in connection with, the Accounts." Both the agreement and assignment were to be governed by New York law. *Id.*

Concerning the account of Mr. Benedi-Garcia, a separate settlement agreement was reached with ACLI some four months later, on November 26, 1980. The parties executed a Deed of Mutual Release providing in part:

WHEREAS:

A. Acli claims that Mr. Benedi-Garcia is indebted to Acli in the sum of $315,238.50 US dollars and has commenced proceedings in the Office des Poursuites, Geneva, Switzerland ... for the recovery of that sum.

B. Mr. Benedi-Garcia denies that he is indebted to Acli in that sum or any other sum whatsoever.

C. Acli and Mr. Benedi-Garcia have reached agreement for the settlement of all differences between them as hereinafter appears.

ACLI then released and discharged Benedi-Garcia "from the said debt and all other debts and obligations of whatever nature which may be or are outstanding at the date hereof from Mr. Benedi-Garcia to Acli." Benedi-Garcia, in turn, released ACLI from all debts and other obligations due to him by ACLI. The parties agreed that this agreement was to be governed by English law. Banque Memo, Ex. 3.

This complicated, historical background accounts in large part for the slow pace of this litigation. Thus far, a judgment of default has been entered against Advicorp, after its failure to appear and answer. An earlier motion by the Banque to dismiss was denied, and extensive discovery ensued, limited primarily to the issues on these summary judgment motions. The Banque now moves for summary judgment or, alternatively, for separate trial, arguing that ACLI can no longer sue defendants for conspiracy to evade position limits because (1) ACLI assigned those rights away, and (2) ACLI's release of Benedi-Garcia automatically released the Banque. In addition, the Banque argues that ACLI has failed to raise a triable issue of fact on its claim of fraudulent inducement. The defendant Nahas has simultaneously moved to dismiss ACLI's complaint, and has joined the Banque's motion for summary judgment or separate trial. ACLI, in turn, has moved for partial summary judgment on the effect of the assignment agreement, claiming that as a matter of law an assignment of accounts receivable does not include an assignment of fraud. ACLI also argues that issues of fact exist with respect to its claim of fraudulent inducement, requiring a trial on the merits.

For the reasons that follow the summary judgment motions made by the Banque and Nahas are denied; ACLI's motion for partial summary judgment on the effect of the assignment to Caldas is granted, and ACLI is also granted summary judgment on the effect of the Benedi-Garcia release. ACLI's claim of fraudulent inducement must be tried to determine Nahas' potential liability. In light of the above rulings, the Banque and Nahas' motions for a separate trial on the validity and effect of the assignment agreement and the Benedi-Garcia release are denied. A separate trial may be warranted on the issue of fraudulent inducement, but a final ruling on this matter will be deferred until the parties have had an opportunity to brief the issue.

### The Effect of the Assignment To Caldas.

To succeed on its motion for summary judgment based on ACLI's assignment to Caldas, the Banque must first establish that the assignment of all ACLI's right, title, and interest in the nine accounts, including all claims and causes of action

against the account "owners," deprives ACLI of the right to sue the Banque to recover the difference between what ACLI was paid for the assignment and what it was owed on the accounts. This could be established either because the Banque is an "owner" of the accounts and therefore subject to suit only by Caldas, or because the assignment carried with it not only the right to collect the sums due, but also the right to collect those sums from third parties guilty of fraud in causing the delinquencies. Neither of these arguments is persuasive.

### A. *Covenant Not to Sue "Owners of the Accounts".*

The Banque claims that, when ACLI executed the July 23 assignment in which it covenanted not to sue the "owners of the Accounts," the term was not meant to be limited to the nine named account holders. Rather, the phrase was allegedly intended to include "[a]ny person that has any responsibility or obligation with respect to the amounts owed under the accounts." Getraer Tr. 152, *reprinted in* Banque Memo at 59. The Banque notes that ACLI's Amended Complaint states that the Banque "owned and/or controlled" the accounts. Banque Memo at 59, quoting ACLI Amended Complaint at ¶¶ 14, 25. Hence, the Banque contends, if ACLI were able to establish the claim of Banque ownership or control, it would necessarily also establish that the Banque would be included in the release as an "owner" of those accounts. Banque Memo at 58–61.

Mr. Getraer, an attorney for Nahas, has testified that at the negotiations he told Mr. Grant, ACLI's attorney, that the word "owners" was intended to be "purposefully vague"—that "it was definitely not limited to claims against just the identified individuals, because I did not know who was responsible in the sense of having to pay for the deficits that arose in those accounts." Getraer Tr. at 190, *reprinted in* Banque Memo at 59. According to Getraer:

The term "owners of the accounts" was put in purposely at my insistence because of my concern that the rights being transferred to Caldas and Nahas would be as broad as possible, and were there to be any other entity, person, or corporation who had responsibility, other than an identified name, which were the debtors, which is not used in the assignment, all of the rights against that purposefully vague concept of owner were being transferred.

Getraer Tr. at 132–33, *reprinted in* Banque Memo at 58. The Banque states that, had the term "owners of the accounts" been intended to be limited to the nine individuals, the assignment would have referred to those individuals as "Debtors," as did the April 28 agreement. Banque Reply Memo, App. III, at 5.

Mr. Grant, who represented ACLI in the negotiations, states that he has no recollection of Mr. Getraer's ever discussing the meaning of "owners of the Accounts" and that he would not have agreed to making the term "purposefully vague." Rather, the intent of the agreement was to implement and not broaden or make substantive changes in the prior April 28 agreement and both Mr. Getraer and I agreed on this goal. There was nothing in the April 28 agreement that would suggest or permit an inference that the rights acquired or to be acquired by the nine individuals listed in that agreement and listed again in the July 23 agreement would be given to others not referred to in either agreement. I never agreed to add unnamed individuals or entities who would benefit from the July 23 agreement because this would have changed and enlarged, not implemented the April 28 agreement. Specifically, I never agreed that [the Banque] was, under any construction, to have been a beneficiary of the latter agreement. There was no discussion of any such subject. The phrase "owners of the accounts" was intended to have, and was given, the only ordinary and reasonable meaning that it could have in the context of both agreements—the nine account holders listed

on both those agreements. I regard any suggestion to the contrary as frivolous. ACLI Rule 3(g) Statement, Grant Aff. at 2–3.

The Banque's suggestions that it is entitled to summary judgment was based on a record that did not contain Mr. Grant's denial. Presently, the record certainly requires the Banque's motion to be denied on this ground.

■ More than that, however, the record justifies granting ACLI's motion for summary judgment on this issue. The contrasting versions of the assignment negotiations advanced by ACLI and the Banque fail to create a genuine dispute of material fact, because the absence of any agreement to assign ACLI's fraud claim against the Banque is established by the clear language of the assignment agreement. The "owners of the Accounts" referred to by the parties in the Assignment agreement were expressly listed as the nine account holders. *See* Banque Memo, Ex. 1. And where the language of a contract is clear, a party may not create ambiguity through extrinsic evidence of unexpressed intentions. *See* 1 *Williston on Contracts* § 95 at 344, 350 (3d ed. 1957); *see e.g.*, *Tobin v. Union News Co.*, 18 A.D.2d 243, 245, 239 N.Y.S.2d 22, 25 (1963), *aff'd*, 13 N.Y.2d 1155, 247 N.Y.S.2d 385, 196 N.E.2d 735 (1964) (extrinsic evidence is admissible to resolve an ambiguity, not to create one); *Tramco Industries, Inc. v. Broad Hollow Associates*, 30 A.D.2d 522, 290 N.Y.S.2d 260, 261 (1968), *aff'd*, 23 N.Y.2d 841, 297 N.Y.S.2d 739, 245 N.E.2d 408 (1969) (same). As stated by Judge Learned Hand in *Hotchkiss v. National City Bank of New York*, 200 Fed. 287, 293 (S.D.N.Y.1911), *aff'd*, 201 Fed. 664 (2d Cir.1912), *aff'd*, 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913):

If ... it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake, or something else of the sort. Of course, if it appear by other words, or acts, of the parties, that they attribute a peculiar meaning to such words as they use in the contract, that meaning will prevail, but only by virtue of the other words, and not because of their unexpressed intent.

Moreover, even assuming that the phrase were sufficiently ambiguous to justify consideration of extrinsic evidence, the Banque has advanced no credible evidence supporting a different interpretation of the term "owners." Mr. Getraer's recollection that he intended the phrase "owners of the Accounts" to be "purposefully vague" is improbable on its face, and is squarely contradicted by Mr. Grant's affidavit. Affidavit of Mr. Grant at 2–3. Mr. Getraer's broad definition of the term is also contradicted by his own contemporaneous writing. *See* Letter from Joseph Getraer to William P. Rogers (June 23, 1980) (enclosing general release forms to be signed by the nine account holders, and stating "Also enclosed for your review are copies of the form of General Release to be delivered to ACLI from the owners of the accounts maintained by ACLI and others.") At his deposition, Getraer conceded that the phrase "owners of the accounts maintained by ACLI and others" referred to "those who were going to deliver releases to ACLI," Deposition of Joseph Getraer at 240–43—namely, the nine account holders. *Id.* at 246, 249. Mr. Gatraer further acknowledged that the term "owners of the Accounts" nowhere appears in the April 28 agreement, *id.* at 218, which he helped to draft, *id.* at 130, and that the July 23 assignment was "prepared to implement the April agreement." *Id.* at 124–25.

The phrase was a fundamental part of the bargain. It described the beneficiaries of the contract, to whom a release was being conferred in exchange for a payment of an amount far short of the loss incurred. The parties must be presumed to have bargained carefully on so fundamental a matter, yet no one suggested during the negotiations that other owners existed, except for Benedi-Garcia, whose name was deleted from the list. And no one in fact claims to have had the Banque or any other specific

person or entity in mind in using the phrase, so no meeting of minds or bargained-for-exchange could have been reached with respect to other owners.

Finally, while the Banque is willing to assume it is an owner for this aspect of its motion, it in fact flatly denies that it had a financial interest in the accounts. *See* Banque Answer ¶ 5; Banque Admission ¶ 21. A party often may properly seek summary judgment on the basis of an assumed set of facts. Here, however, by proceeding on the basis of an assumption that it was an owner, rather than admitting it was one, the Banque builds its claim that other owners were intended on assumptions rather than evidence. Summary judgment may neither be obtained nor avoided with theoretical possibilities, but only with real evidence. *E.g., Krisel v. Duran,* 258 F.Supp. 845, 860–61 (S.D.N.Y.1966), *aff'd,* 386 F.2d 179 (2d Cir.1967), *cert. denied,* 390 U.S. 1042, 88 S.Ct. 1635, 20 L.Ed.2d 303 (1968) (mere assertion of a claim is not sufficient to ward off summary judgment). As Professor Moore states, "[T]he opposing party's facts must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions." 6 J. Moore, W. Taggart & J. Wicker, *Moore's Federal Practice* ¶ 56.-15[3] at 56–486 to 56–487 (2d ed. 1983) (footnotes omitted). In this case, the proposition advanced by the Banque—that the parties intended to cover other "owners"— could conceivably assume some credibility if some such owner actually appeared or could be identified, so that the notion of an expansive interpretation might have some evidentiary substance. But no such owner has actually been shown to have existed. The Banque has therefore failed to present sufficient evidence to warrant a trial on this question, let alone the expedited trial it seeks, even were the phrase theoretically susceptible of the broad construction it has proposed. *See First National Bank v. Cities Service Co., Inc.,* 391 U.S. 253, 288–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968) (to avoid summary judgment, evidence in support of claimed factual dispute must be significantly probative); *Weit v. Continental Illinois National Bank & Trust Co.,* 641 F.2d 457, 461–63 (7th Cir. 1981), *cert. denied* 455 U.S. 988, 102 S.Ct. 2001, 72 L.Ed.2d 461 (1982) (granting summary judgment in defendant's favor in antitrust case, finding "no significant probative evidence of a conspiracy"); *Neely v. St. Paul Fire & Marine Insurance Co.,* 584 F.2d 341, 346 (9th Cir.1978) (granting summary judgment for defendant and finding that plaintiff's evidence would not "rationally support" a verdict in his favor); *Illinois v. Climatemp, Inc.,* 91 F.R.D. 252, 254 (N.D.Ill.1981) (summary judgment appropriate where no evidence exists which would support a judgment for nonmoving party if the case was to go to trial); *Griffith v. William Penn Broadcasting Co.,* 4 F.R.D. 475, 477 (E.D.Pa.1945) (summary judgment appropriate where the parties are unable to establish, with substantial competent evidence, a genuine issue of material fact); Schwarzer, *Summary Judgment under the Federal Rules: Defining Genuine Issues of Material Fact,* 99 F.R.D. 465, 487 (1983) (where an inference adverse to the moving party is not sufficiently plausible that it could reasonably be drawn by a jury, summary judgment is appropriate); 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2727 at 165 (1983) ("evidence in opposition to [a motion for summary judgment] that clearly is without any force is insufficient to raise a genuine issue").

## B. *Effect of the Assignment of "all Claims."*

■ The difficulties in determining the effect of assignments stems largely from the dramtic changes that have occurred in the common law over what rights are assignable. *See* E. Farnsworth, *Contracts* § 11.2 (1982). The law has moved away from the limitations on free assignability to the point that New York law now permits the assignment of most types of claims, including claims of fraud, and the guiding statutory principle is that the assignee of a claim should be deemed to have received

the right to enforce any claim assigned. N.Y.Gen. Oblig. Law §§ 13–105 & –107 (McKinney 1978); *Morse v. Swank, Inc.,* 459 F.Supp. 660 (S.D.N.Y.1978). The parties to an assignment are now free to agree by contract to virtually any form of assignment, subject to such general limitations as the principle that an assignee can receive no greater rights than the assignor possessed.

This sweeping change in the law of assignments presents the greatest difficulties in situations where the parties have failed expressly to deal with a particular claim. When the law disfavored the assignment of claims, courts naturally were reluctant to find that claims beyond those expressly conveyed had been transferred to the assignee. As free assignability is now the guiding principle, courts—including those of New York—have turned to modern contact principles to find more readily that claims other than those mentioned in an assignment were conveyed to the assignee. *See generally* 6A C.J.S. *Assignments* (1975).

The Banque relies on two such contract principles. First, it contends that, by assigning the accounts receivable, ACLI assigned with them any and all means of collecting the sums due, including ACLI's fraud claim against the Banque. An assignment of a debt, the Banque points out, automatically transfers all means of obtaining its payment. *See, e.g., Kintzel v. Wheatland Mutual Insurance Association,* 203 N.W.2d 799, 805, 65 A.L.R.3d 1110 (Iowa 1973); *Banque de Paris et des Pays-Bas v. Amoco Oil Co.,* 573 F.Supp. 1464, 1470 (S.D.N.Y.1983) (assignment includes bargained-for remedial procedure); 6A C.J.S. *Assignments* § 76, at 719 (1975) ("an assignment ordinarily passes whatever is necessary to make it completely effectual....") The Banque also relies on the principle that an assignor is not permitted to take any action that could limit the value of what was assigned. *See, e.g., Patrons State Bank & Trust Co. v. Shapiro,* 215 Kan. 856, 528 P.2d 1198, 1203 (1974). Here, the Banque claims, ACLI is seeking to recover from the Banque the very sum

that it lost on the assigned accounts, and this action therefore undermines the value of what ACLI assigned to Caldas, presumably because, if ACLI succeeds in this action, Caldas will somehow be prevented from collecting on the accounts. The Banque also reasons that ACLI must not be permitted to sue because it suffered a single injury for which the law prevents a "double recovery."

With respect to the Banque's first contention, ACLI responds in part by invoking what it characterizes as a rule of New York law that requires an assignment of any kind expressly to convey a related claim of fraud. This alleged rule of construction appears most clearly in *Elias v. Clarke,* 143 F.2d 640, 644 (2d Cir.), *cert. denied,* 323 U.S. 778, 65 S.Ct. 191, 89 L.Ed. 622 (1944), in which Judge Clark found that "under the governing New York law a claim for fraud or misrepresentation in connection with an obligation evidencing a debt, whether for damages or rescission, does not pass merely with the transfer of the obligation itself, where there are lacking special words of assignment of the claim." Judge Clark's language is a classic example of *dicta,* since he later assumed that the claim was in fact transferred. In any event, the New York legislature expressly overturned the rule described in *Elias v. Clarke* in 1950, providing that, "[u]nless expressly reserved in writing, a transfer of any bond shall rest in the transferee all claims or demands of the transferrer, whether or not such claims or demands are known to exist ...," against the obligor, trustee, guarantor, or depository of the bond. N.Y.Gen. Oblig. Law § 13–107(1) (McKinney 1978). The statute goes on to define "bond" to include "any and all shares and interests in an issue of bonds, notes, debentures or other evidences of indebtedness...." *Id.* § 13–107(2).

Arguing that "accounts receivable" are not "bonds" within the meaning of the statute, ACLI claims that, in passing the statute, the legislature carved out a "narrow exception" to the New York rule on the assignment of fraud claims, and that

the statute reaffirms the "long-standing" rule in all other cases. *See Herzberg v. Finch*, 321 F.Supp. 1367, 1369 (S.D.N.Y. 1971) (applying *expressio unius* principle). No such reading is appropriate here. The statute should be seen to teach by example, rather than to exclude by implication. *See Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 392, 90 S.Ct. 1772, 1783, 26 L.Ed.2d 339 (1970) ("[A] statute may reflect nothing more than the dimensions of the particular problem that came to the attention of the legislature, inviting the conclusion that the legislative policy is equally applicable to other situations in which the mischief is identical"). Moreover, the "long-standing rule" that ACLI claims was implicitly affirmed by the "statutory exception" is in fact represented by a mere handful of cases, which fail to establish any such rule. The case plaintiffs characterize as the "leading" authority for their position, for example, *Fox v. Hirschfeld*, 157 App.Div. 364, 142 N.Y.S. 261 (1913), was a 3–2 decision based on very special circumstances. The court permitted the assignor of a contract on a house to sue a third party, allegedly responsible for fraudulent representations "de hors the contract," because the language employed in the assignment was not appropriate to assign such a cause of action. But the majority was no doubt affected by the fact that the assignee was the assignor's wife, and that she had paid her husband nothing for the house. 142 N.Y.S. at 264. Had the assignee paid for the contract in an arms-length transaction before discovery of the fraud, the same court would likely have found that the cause of action passed to the assignee, absent evidence of an intention that it be retained by the assignor. In such circumstances the accrued action for fraud would be "essential to a complete and adequate enforcement of the contract, [and therefore] it passes with an assignment of the contract as an incident thereof." 6A C.J.S. *Assignments,* § 77, at 721 (1975) (footnote omitted). This is presumably the rationale for the decision in *Beck-Brown Realty Co. v. Liberty Bell Insurance Co.*, 137 Misc. 263, 241 N.Y.S. 727

(Sup.Ct.1930), in which the assignee of an insurance contract was permitted to sue for fraud or mistake.

The Banque, however, cannot directly rely on § 13–107 as a defense to ACLI's claim. The change made in New York law by § 13–107 was designed to enable the assignee of a bond or other similar instrument to take all the assignor's rights in the paper assigned, and to sue the obligor directly. The operative paragraph of § 13–107 refers specifically to "bonds," not to "evidences of indebtedness." N.Y.Gen. Oblig. Law ¶ 13–107 (McKinney 1978). And the statute was designed to overrule two cases, *Elias v. Clarke*, 143 F.2d 640, 644 (2d Cir.1944), and *Smith v. Continental Bank & Trust Co.*, 292 N.Y. 275, 54 N.E.2d 823 (1944), both of which involved an assignment of bonds. The legislature apparently concluded that assignees of bonds, notes, and other forms of commercial paper should be entitled to protect the value of such forms of paper by being entitled, absent an express limitation, to sue the debtor, obligor, trustee, or depository on any theory available to the assignor. The statutory rule thereby simplified the assignee's task of collection and protected the value of certain forms of highly negotiable, commercial paper.

An ordinary account receivable is not a "bond" within the meaning of the statute. The "evidences of indebtedness" contemplated in the statute appear to refer to those instruments similar to bonds on which suit could be brought, or collection made, without the assertion of defenses or counterclaims, whether related or unrelated to the underlying transaction. An account receivable, on the other hand, is normally subject to claims and defenses made by the debtor prior to receiving notice of the assignment, in addition to defenses based on the general rule that the assignee cannot take more than the assignor had to give. *See* E. Farnsworth, *Contracts* § 11.8, at 780–81. An account receivable, in short, is not treated in commerce with the same degree of negotiabili-

ty as are books, stock, notes, and other such evidences of indebtedness.

The Banque is also precluded from relying upon § 13–107 because it is neither an "obligor" nor a debtor, nor a trustee or depository. The Banque correctly argues that the term "obligor" has and can be used in virtually any context, and that in some contexts it could include persons liable for fraud or other torts. ACLI itself referred to the Banque as an "obligor" on the assigned accounts in its assignment to A.C. Israel Enterprises. But the context of § 13–107 is clear and distinctly different from any referred to by the Banque and from the context in which ACLI characterized the Banque as "obligor." In the statute the word is used to mean the party obligated on the evidence of indebtedness that is assigned. Here, if the word were used to describe the Banque's alleged role, its meaning would be forced to include an alleged joint tortfeasor, who may or may not have an unrevealed interest in the assigned accounts. The statutory language does not support so broad a meaning for "obligor" or "debtor," and the statute's purpose—to enhance the enforceability of highly negotiable forms of indebtedness—does not require adding as potential defendants unnamed joint tortfeasors to those obligors named on or in custody or control of such evidences of indebtedness.

The Banque's reliance on § 13–107 is sound, however, to the extent the Banque contends that the statute reflects the legislature's willingness to presume the assignment of all claims in order to enhance felt commercial needs. The Banque's argument founders, however, when the circumstances surrounding the assignment are examined to determine whether ACLI and Caldas intended that ACLI's rights against the Banque would pass to Caldas with the right to collect the account deficits. *See Restatement (Second) of Contracts* § 328, comment b (1981) (section that provides that an assignment of "the contract" is an assignment of the assignor's rights under the contract is a presumptive interpretation that yields to a manifestation of a different intention); *id.* § 317(1) ("an assignment of

a right is a manifestation of the assignor's intention to transfer ..."); E. Farnsworth, *Contracts,* § 11.3, at 754 (1982) ("[w]hether the owner of the right has manifested an intention to transfer it is a question of interpretation to be answered from all the circumstances, including his words and other conduct."). The Agreement of April 28, 1980 contains only a promise by ACLI to assign "the commodity futures account deficit balances (i.e. accounts receivable) owed to ACLI" by nine specified persons, not including the Banque. Banque Memo, Ex. 1. The Assignment of July 23, 1980 provides that "ACLI has agreed to assign to Caldas all of its right, title and interest in and to each of the accounts receivable" for the same nine accounts. It also expressly includes "all rights, claims and causes of action that ACLI has *against the owners* of the Accounts," and ACLI promised "that it shall not at any time present or prosecute any form of action whatsoever *against the owners* of the Accounts arising out of, or in connection with, the Accounts." *Id.* (Emphases added.) These provisions reflect an intention to transfer all causes of action—including any for fraud—but only those against the specified "debtors" or "owners" of the accounts, not against unspecified third parties such as the Banque.

The testimony concerning the negotiations also indicates that the parties were aware of the possibility that ACLI might later sue other entities, including specifically the Banque. Thus, the April Agreement provided that neither the purchaser (Caldas) nor *"any other entity* or individual" should be deemed by the agreement to have admitted any wrongdoing or responsibility for the accounts receivable. *Id.* (emphasis added). Furthermore, Mr. Getraer, who acted as Nahas' counsel, testified that he was aware of other entities that might be covered by the releases that were issued. ACLI in fact retained counsel in May 1980, two months before the Assignment, to prepare a lawsuit against the Banque. Katz Affidavit at ¶ 22. The Banque also must have been aware of its potential

liability, since it had been sued by the CFTC during 1979–1982, upon its refusal to disclose to the CFTC the identity of its customers holding silver futures positions in its accounts. The Banque nevertheless was not represented at the negotiations between ACLI and Nahas, did not participate in them, was not mentioned in them, and contributed nothing to the settlement. Response and Objections of Defendant Banque Populaire Suisse to Plaintiffs' First Request for Admissions, Sept. 12, 1983, ¶¶ 43, 44. The only evidence that its interests were considered at all is Mr. Getraer's extraordinary testimony that he left the phrase "owners of the Accounts" purposefully vague so that it could include any other, unspecified persons or entities. Purposeful vagueness under the circumstances could hardly succeed in creating a meeting of minds or other commercially respectable understanding among the participants, particularly when the attorneys representing Nahas concede they were not acting on behalf of the Banque (Robinson Tr. 266). Finally, principal officers of ACLI have sworn that they did not intend by the assignment to release or convey the fraud claim against the Banque, and no one has sworn otherwise. *See* Katz Affidavit at ¶ 22; Israel Affidavit at ¶¶ 2–3.

The Banque's second contention is that an intent to convey the cause of action for fraud should be inferred or presumed, because the rights conveyed would otherwise be "vitiated." *See Shapiro*, 528 P.2d at 1203. This argument is based ultimately on a scenario in which ACLI has recovered against the Banque, and Caldas thereafter sues the named account owners for the full amounts due on the accounts. According to the Banque, the account owners could thereupon successfully argue that Caldas could not recover from the owners the sums ACLI is able to recover from the Banque. Only one $28 million loss was incurred, the Banque contends, and it can only be collected once.

The Banque seems wrong in claiming that only $28 million can be collected. To begin with, if the assignment is to be treated as genuine, it represents an arrangement whereby some $36 million could theoretically be collected: $8 million by ACLI from Caldas; and $28 million by Caldas from the account owners. The incentive that often leads assignees to purchase accounts receivable for collection is that they may be able to collect more from the account debtors than they have paid the assignor; and the debtors could not claim, in a suit by the assignee, to be beneficiaries of the assignee's payment in a normal assignment transaction. Furthermore, no magic attaches to the $28 million figure. ACLI's damages from the underlying fraud might well have exceeded that amount, had it been forced into liquidation. ACLI happens to be claiming the difference between the account balances and what it was paid by Caldas, but only because it admits that it suffered no other, consequential damages. Nor will the fact that ACLI claims to have lost $20 million entitle it to collect that amount from the Banque if it is successful. Once again, ACLI's damages will not be measured by what it has lost on the accounts, but by the proportion of its damages in tort for which it is proper to hold the Banque responsible, which in turn will depend upon the extent of the Banque's wrongdoing relative to the wrongdoing of all of its joint tortfeasors, including but not limited to Nahas and the named account owners. That amount may be far less than the $20 million ACLI claims to have lost on the accounts, and most significantly will be measured by considerations related to ACLI's claim for fraud, not by matters related to its claim on the accounts receivable.

■ The Banque's argument also lacks merit because it cannot assert a claim on behalf of Caldas, particularly at a point when only $8 million of the amount at issue has been paid to anyone. No reported decision permits a potentially liable third party to avoid paying for damages it caused, on the theory that in the future circumstances might arise which demonstrate that some *other* party has been prejudiced by the third party's payment. Furthermore, while plaintiff may not recover more than once,

regardless of the number of theories or causes of action advanced, a plaintiff is normally permitted to advance any number of theories and causes of action until having recovered from any available source relief that affords full compensation. *See generally* 1 S. Speiser, C. Krause & A. Gans, *The American Law of Torts* § 5:43 (1983).

To the extent the Banque may suggest that it will be placed in jeopardy of multiple liability by a ruling that it can be sued by ACLI, the suggestion lacks any practical or theoretical basis. As discussed below, the assignment at issue here was a device for settling all claims among the parties. Nahas has not been shown to have intended to obtain accounts receivable which he would collect; to the contrary, the uncontroverted evidence presently indicates that Nahas has not and never will sue any of the named account owners. In any event, moreover, the Banque is in no greater jeopardy as a result of the assignment than any tortfeasor after a joint tortfeasor settles. The Banque is not liable as an account debtor; neither Caldas nor the named account owners could attempt to collect on that basis. The only basis upon which the account owners could sue the Banque would be for contribution, on the theory that their debt was the result of a tort in which the Banque played a role. On the presently uncontroverted assumption, however, that Nahas completely owns and controls Caldas, and that Nahas was a joint tortfeasor with the account owners, no suit is possible by Caldas against any of Nahas' joint tortfeasors, as New York law does not permit such suits. *See* N.Y.Gen. Oblig. Law § 15–108(c) (McKinney 1978). Finally, the Banque can protect itself now against any such suit by taking any necessary steps to notify or join Caldas and/or the account owners as joint tortfeasors, if in fact any such steps are necessary.

The cases referred to by the Banque seem to make clear, however, that Caldas or the account holders would not be able to collect from the Banque to the extent that ACLI, their assignor, collects. *See, e.g., St. Paul Fire & Marine Insurance Co. v.*

*Michigan National Bank of Detroit,* 660 F.2d 196, 199 (6th Cir.1981) (assignee may not maintain action against one *independently* liable when injured party has already received full compensation from another who is also liable). If an assignee cannot sue "X" because the assignor has been paid by "Y", it follows that the assignee cannot sue "Y" either in such circumstances.

But this alleged dilution of the assignee's rights must be evaluated in terms of what the parties to the assignment intended to accomplish. The Banque correctly contends that the assignment was real, not fake; but ACLI has never claimed otherwise. ACLI alleges in its Amended Complaint that the assignment was a device for accomplishing a settlement between ACLI and Nahas (and the named account owners), not only of ACLI's claim for the account balances, but also for any other claims, including fraud or misrepresentation. The assignment was not, in other words, the usual transfer of a group of accounts receivable, ordinarily done for the purpose of obtaining financing from an assignee-lender, or as a means of transferring the task and risks of collection. Here, by contrast, ACLI alleges without contradiction that Caldas is an entity controlled by Nahas, and that Nahas has never viewed the transaction as an opportunity to profit from his purchase of the accounts receivable at a substantial discount. Indeed, ACLI argues, again without contradiction, that neither Nahas nor Caldas has ever sought to collect the account deficits, and that no such effort is likely since the named account owners are relatives or nominees of Nahas whose names he allegedly used to implement his illegal trading.

These circumstances are relevant, because the legal consequences a court should give to a transaction, where no language settles the relevant dispute, must depend on its commercial purposes. Had the assignment been an ordinary transfer of accounts receivable for financing or collection, those commercial objectives would more strongly suggest than the settlement

objective in the present case that the assignee expected to receive and the assignor intended to convey any and all rights of action that could enhance the collectability of the account balances. *See Targa Int'l Corp. v. Gross,* 112 Misc.2d 688, 447 N.Y. S.2d 384 (Sup.Ct.1982) (showing typically broad assignment for financing). In the present situation, because the parties' overriding (perhaps exclusive) purpose was settlement rather than security or collection, the normal expectations of the parties should be assumed to have been the expectations of parties to a settlement: the assignor surrendering claims against a number of potential defendants would normally expect to be paid for each potential source of compensation; and a party securing a settlement, in whatever form, would normally want clear evidence of its release from further liability. The clear settlement objective here reflects an absence of any intention to transfer the assignor's claim against the Banque, and hence also establishes the absence of any right in the assignee to collect from the Banque.

Finally, since the transaction at issue was in substance a settlement, its construction should be guided by the public policy of New York with respect to the effect of settlements in tort actions, clearly expressed in N.Y.Gen. Oblig. Law § 15–108 (McKinney 1978). That statute provides that, when a release is given to one of two or more persons alleged to be liable in tort, it does not discharge any other tortfeasor "unless its terms expressly so provide...." *Id.* The law of New York therefore strongly suggests—if not commands—that the void in the assignment at issue concerning the Banque's continuing liability be treated in the same manner as it would be treated in the release of a joint tortfeasor. The assignment must be read, on the other hand, to reduce the settling assignor's claim against the Banque "to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, or in the amount of the released tortfeasor's equitable share of the damages under article fourteen of the civil

practice law and rules, whichever is the greatest." *Id.*

## II. *Effect of the Benedi-Garcia Release.*

The Banque contends that, under English law, the Deed of Mutual Release executed by ACLI and Benedi-Garcia completely bars ACLI's suit for fraud. The Banque argues that ACLI's presentation of its conspiracy claim by its very nature will implicate Benedi-Garcia in the conspiracy to defraud; that participants in a conspiracy are joint tortfeasors; and that in England the general release of one joint tortfeasor releases all other joint tortfeasors, provided that the release does not indicate an intention to reserve for the releasor the right to sue other joint tortfeasors. Hence, it argues, ACLI's release of Benedi-Garcia from any claim, including implicitly a conspiracy to defraud ACLI of $28 million, thereby released the Banque, Nahas, and Advicorp from that same conspiracy claim. Nahas joins in these contentions.

ACLI points out, however, that at no time has it alleged that Benedi-Garcia was a co-conspirator, nor does it consider him to be one; rather, ACLI simply viewed Benedi-Garcia as being responsible for the $315,238.50 deficit in his account. ACLI argues that, even if the Banque could prove that Benedi-Garcia was a conspirator, the release would have no effect on its conspiracy claim against the Banque, Nahas, and Advicorp. To allow the defendants to rely on the Deed as a defense would constitute a "double fraud," since Benedi-Garcia would first be proven a conspirator, and would also have falsely represented to ACLI that he was not a conspirator in order to induce ACLI to enter into the settlement with him. Finally, ACLI contends that, under English law which governs this question, although the release is general, its effect must nevertheless be limited to its specific recitals.

ACLI's final point is dispositive here. English law provides that if a specific claim is identified in the release—as was the $315,238.50 debt—the release will be limited to that claim, despite the use of general release language. *Simons v. Johnson*

(1832) 3 B. & Ad. 175, 1 L.J.K.B. 98, 110 E.R. 890; *Lampon v. Corke* (1822) 5 B. & Ad. 606, 106 E.R. 1312; *Payler v. Homersham* (1815) 4 M. & S. 423, 105 E.R. 890. A release, though unlimited in its terms, is to be construed on the basis of its recitals and surrounding circumstances and will operate only as to a particular sum mentioned in the recitals. *Lindo v. Lindo* (1839) 48 E.R. 1032, 8 L.J.Ch. (N.S.), 284, 1 Beav. 496.

The Banque's attempt to distinguish the authorities cited by focussing on the particular facts and recitals of each case is to no avail. In fact, *Simons v. Johnson* is directly on point. In that case, the plaintiff Simons brought suit against two parties, who pleaded as a defense a general release executed by Simons in favor of the other defendant, Johnson. The release contained a recital acknowledging "various disputes and differences" between Simons and Johnson and that, to resolve these disputes, Johnson would pay Simons 150 Pounds. 3 B. & Ad. at 176. Simons then agreed to and executed a release of Johnson from "all manner of actions and causes of action, suits, controversies, ... claims and demands whatsoever [which he may have or may hereafter claim] from the beginning of the world to the day of the date of these presents." *Id.* at 177. Despite this extremely broad language, the court held the release to be limited by the recital to "the actions then depending, and that the object was to put an end to them." *Id.* at 181 (Lord Tenderden, C.J.). Justice Taunton supported this construction, concluding that the release was to apply to the disputes between Simons and Johnson only, and not to the other defendant, whose name was not mentioned in the release. *Id.*

Just as the other defendant could not benefit by the release in *Simons*, neither can the defendants here benefit by ACLI's release of Benedi-Garcia from the $315,238.50 debt. The release concerned only ACLI and Benedi-Garcia; no mention was made of third parties. Furthermore, a specific sum of $315,238.50 was mentioned in this release and must control its inter-

pretation. Finally, as in *Simons*, the release presented here contains general language, but the language is qualified by specific recitals which reflect the parties' obvious intentions. ACLI surely did not intend to relinquish its ability to recover nearly $20 million from the Banque, Advicorp, and any other responsible party, when it released Benedi-Garcia in consideration for his payment of part of the outstanding debt. *See* Deposition of H. Chester Grant at 123. Although the Banque would have this court believe that ACLI "gave away the ranch" (Reply Memo at 22), the disparity between the consideration paid and the amount which ACLI lost is strong evidence that ACLI had no intention of releasing Benedi-Garcia or anyone else from an amount greater than $315,238.50. Thus, while ACLI is no longer entitled to collect the $315,238.50 arising under Benedi-Garcia's account, from Benedi-Garcia or from any joint tortfeasor, ACLI is not barred by the release from pursuing against others its fraud claim for $20 million.

ACLI has not moved for summary judgment on the effect of the release. Summary judgment is nevertheless sometimes appropriate for the non-moving party. 6 J. Moore, W. Taggart & J. Wicker, *Moore's Federal Practice* ¶ 56.12 at 56–334 (2d ed. 1983); *Commission on Independent Colleges and Universities v. New York Temporary State Commission on Regulation of Lobbying*, 534 F.Supp. 489, 501 (N.D.N.Y.1982) (where no material factual dispute exists, non-movant is entitled to summary judgment). Defendants have failed to present evidence that creates a genuine dispute as to any material fact. Accordingly, summary judgment will be entered for ACLI on this issue.

### III. *ACLI's Claim of Fraudulent Inducement.*

The Banque has failed to establish that it is entitled to rely on the assignment to Caldas as a defense to ACLI's claim on the merits. Nevertheless, the Banque's motion for summary judgment on ACLI's fraudulent inducement claim must be reached.

Nahas has joined in the Banque's motion; he acted through Caldas, and obtained a release in his own name which ACLI claims was fraudulently induced. Furthermore, the Banque has an interest in the issue, since the extent of its potential liability depends on whether the ACLI—Nahas settlement is sustained. *See* N.Y.Gen. Oblig.Law § 15–108(a) (McKinney 1978).

 The Banque and Nahas correctly contend that a plaintiff should not be able to undermine a settlement, arranged by counsel after extensive negotiations, on vague allegations as to what was then said about the defendant's available assets. On the other hand, summary judgment should be cautiously invoked in fraudulent inducement cases, which raise issues that often turn on credibility or inference, such as intent and reliance. *E.g., Schmidt v. McKay*, 555 F.2d 30, 37–38 (2d Cir.1977). Here, the testimony creates several genuine issues of material fact that preclude summary judgment for Nahas or the Banque.

ACLI claims it actually reached an agreement whereby Nahas promised to pay all the losses in the relevant accounts. Thereafter, this agreement was allegedly repudiated by Nahas and his negotiators on the basis of clear representations that Nahas was being sued for hundred of millions of dollars, that he lacked the resources to pay all his debts, and that only $8 million could be paid to ACLI. *See, e.g.,* Maringer Tr. 76, 81–88; Stoller Tr. 30, 119–20, 122; Blomme Tr. 38. ACLI claims it sought verification from Nahas of his financial status, but was denied access to any details. ACLI also claims that it conducted its own investigation, but found nothing reliable to refute the representations of Nahas' attorneys. ACLI asserts that its officials were skeptical of these representations, and that some did not believe the statements were true. They nevertheless decided to rely on Nahas' claims, according to ACLI, because they had no way to prove the claims were false. After the agreement, ACLI alleges, it became satisfied that Nahas had lied

about his wealth, so ACLI sued to recover its full losses.

Defendants argue that the alleged misrepresentations are too vague to warrant being treated as possible bases upon which businessmen could rely. They say the representations amounted to no more than some modified versions of Nahas saying he would pay only $8 million, the kind of statement regularly made at negotiations. But the words alleged, and their context, do not permit a court to accept defendants' version on summary judgment. ACLI claims the parties had agreed to a far higher payment, and that Nahas subsequently said he could not raise the money to pay the full amount agreed. Plaintiff contends that Nahas' attorney Robinson, and his French lawyer Fadlallah, said Nahas would not pay more than $8 million because he could not pay more. A jury could conclude that ACLI would have held out for more if Nahas had simply taken the position that he would not pay more even though he was able to pay more.

Defendants argue that ACLI did not in fact rely on the alleged misrepresentations, but merely chose to accept them until it had collected the $8 million offered. "What Mr. Katz was apparently saying was that ACLI decided to take the $8 million which Nahas was offering and then assert the alleged misrepresentation to avoid the transaction and sue for more." Banque Memo at 48. This argument actually distorts Katz's statement and ACLI's position. Katz said he relied on the representations because he had no choice in light of the absence of any way to contest Nahas' claims, presumably in part due to Nahas' use of nominee accounts and secrecy laws to protect himself from exposure. ACLI therefore did not "deliberately" rely on obviously incomplete financial information in order to preserve a cause of action. *Cf. Seaboard Finance Co. v. Costanzo*, 34 Misc.2d 54, 55–56, 227 N.Y.S.2d 612, 613–14 (Dist.Ct.1962). Rather, ACLI accepted representations which, despite its best efforts,

it could not disprove, on the implicit understanding—supported by the very doctrine of false representation—that if Nahas had lied, ACLI would be able to sue for more than the agreed amount.

 Defendants suggest that ACLI's argument is legally untenable, because the alleged misrepresentations were not incorporated into the agreements between ACLI and Caldas. Moreover, the Agreement of April 28, 1980 contains a so-called merger clause stating: "This Agreement constitutes the entire understanding among the parties and supersedes all prior agreements or understandings among the parties." Banque Memo, Ex. 1. Though these facts are proper evidence of nonreliance, the merger clause does not bar ACLI's fraudulent inducement claim. *Crowell-Collier Publishing Co. v. Josefowitz,* 9 Misc.2d 613, 170 N.Y.S.2d 373 (Sup.Ct. 1957), *aff'd,* 5 A.D.2d 987, 173 N.Y.S.2d 992 (1958), *aff'd,* 5 N.Y.2d 998, 184 N.Y.S.2d 859, 157 N.E.2d 730 (1959); *Centronics Financial Corp. v. El Conquistador Hotel Corp.,* 573 F.2d 779, 782 (2d Cir.1978). Furthermore, the agreements between ACLI and Caldas do not contain language that would more convincingly have demonstrated a lack of reliance, such as a clause making clear that no representations or warranties had been made, particularly with respect to Nahas' ability to pay. A jury may find significance in the absence of such a clause.

Finally, defendants fail to establish the absence of a triable issue as to the falsity of the alleged misrepresentations. The evidence thus far advanced by ACLI to prove that Nahas lied about his wealth in 1980 largely reflects Nahas' wealth at later times, specifically 1981 to 1983. ACLI correctly points out, however, that the assets Nahas appears to have owned in 1981 and later are of types that he was likely also to have owned in 1980. Furthermore, Nahas' recently filed affidavit on the jurisdictional issues in Brazil indicates that his holdings are so substantial (by his admission "amaz-ing" and "one of the largest Brazilian fortunes") as to raise an inference that he has held much or all of that wealth for over four years. *See* Quinlan Affidavit of Feb. 1, 1984, Ex. A, at 34. ACLI has not even had discovery of Nahas, moreover, and must be given an adequate opportunity to show that he in fact had adequate wealth in 1980 to pay more than $8 million in settlement of ACLI's claims.

### IV. *Motion for a Separate Trial*

The Banque has moved for a separate trial on certain issues, under Rule 40 of the Federal Rules of Civil Procedure. No trial is necessary at all on the meaning of "owners of the Accounts" or on the effect of the Benedi-Garcia release, for the reasons given above. Although not formally requested by the parties, a separate trial may make sense on the issue of fraudulent inducement. The evidence relating to that issue will differ from the evidence relating to the underlying fraud. The trial of that issue may also result in removing Nahas from the case; in any event, after resolution of the fraudulent inducement claim, the parties will be in a far better position to evaluate the potential liability of each defendant, making settlement more likely. Moreover, a trial of both issues together might prejudice Nahas, since the jury will be informed that he paid $8 million to settle the very claim in dispute. In light of these considerations, the parties will be afforded an opportunity to brief this question, and a final ruling will be deferred until that time.

SO ORDERED.